# EXHIBIT A

## II. BPD ENGAGES IN A PATTERN OR PRACTICE OF CONDUCT THAT VIOLATES THE UNITED STATES CONSTITUTION AND LAWS, AND CONDUCT THAT RAISES SERIOUS CONCERNS

The Civil Rights Division of the United States Department of Justice opened this investigation pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"), Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d ("Safe Streets Act" or "SSA"), and Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12131–12134. Section 14141 prohibits law enforcement agencies from engaging in a pattern or practice of conduct that violates the Constitution or laws of the United States. Where such a pattern or practice exists, Section 14141 grants the Attorney General authority to bring suit for equitable and declaratory relief to remedy it. A pattern or practice exists where violations are repeated rather than isolated. *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 336 n.16 (1977) (noting that the phrase "pattern or practice" "was not intended as a term of art," but should be interpreted according to its usual meaning "consistent with the understanding of the identical words" used in other federal civil rights statutes). An unlawful pattern or practice does not require any specific number of incidents. *United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) ("The number of [violations] . . . is not determinative. . . . In any event, no mathematical formula is workable, nor was any intended. Each case must turn on its own facts."); *see also Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 278 (4th Cir. 1980) (holding in the context of employment discrimination that a plaintiff may show a pattern or practice through statistical evidence or a "sufficient number of instances of similar discriminatory treatment"). Title VI and its implementing regulations prohibit recipients of federal financial assistance, such as BPD, from discriminating on the basis of race, color, or national origin. Title VI provides that no person shall "be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance" based on race. 42 U.S.C. § 2000d. The Title VI implementing regulations ban recipients of federal funds from using "criteria or methods of administration" that have an unnecessary disparate impact based on race. 28 C.F.R. § 42.104(b)(2). The Safe Streets Act likewise prohibits law enforcement practices that cause disparate impact based on race except where such impact is necessary to achieve nondiscriminatory objectives. *See* 28 C.F.R. § 42.203. The ADA, which applies to BPD's services, programs, and activities, including on-the-street encounters, arrests, and transportation to a hospital for mental health evaluation, *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a); requires BPD to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7); *Title II Technical Assistance Manual* § II-3.6100, at 14.

Our investigation finds that BPD engages in a pattern or practice of conduct that implicates our statutory authority. This pattern or practice is rooted in BPD's deficient supervision and oversight of officer activity, leading directly to a broad spectrum of constitutional and statutory violations. This lack of supervision and oversight includes BPD's failure to use effective and widely-accepted methods to supervise officers, collect and analyze data on officer activity, and classify, investigate, and resolve complaints of misconduct. This pattern or practice is also manifested in several ways that violate specific constitutional and statutory provisions: (1) BPD stops, searches,

and arrests individuals on Baltimore streets without the reasonable suspicion or probable cause required by the Fourth Amendment; (2) BPD disproportionately stops, searches, and arrests African Americans in violation of Title VI and the Safe Streets Act, and this disparate impact, along with evidence suggesting intentional discrimination against African Americans, exacerbates community distrust of the police; (3) BPD uses unreasonable force in violation of the Fourth Amendment; (4) BPD violates the First Amendment rights of Baltimore residents by using force or otherwise retaliating against individuals exercising constitutionally protected activity, such as public speech and filming police activity; and (5) BPD's use of force against individuals with mental health disabilities or experiencing crisis violates the Americans with Disabilities Act. To illustrate these violations, throughout this letter we provide several examples of each type of violation that we found during our investigation. In some sections we provide more examples to illustrate the variety of circumstances in which the violation occurs, while in others we focus on one or two examples that demonstrate the nature of the violations we found. The number of examples included in a particular section is not indicative of the number of violations we found. These examples comprise a small subset of the total number of incidents upon which we base our conclusions.

We make these findings after a comprehensive 14-month investigation into BPD's practices. To gain the broadest possible perspective on the challenges facing BPD, our investigation involved reviewing an exhaustive set of documents and meeting with hundreds of officers, community members, city leaders, and other stakeholders. In total, we reviewed hundreds of thousands of pages of documents, including all relevant policies and training materials used by the Department since 2010; BPD's database of internal affairs files; a random sample of about 800 case files on non-deadly force incidents; files on all deadly force incidents since 2010 that BPD was able to produce to us through May 1, 2016; a sample of several hundred incident reports describing stops, searches, and arrests; investigative files on sexual assault cases; databases maintained by BPD and the State of Maryland containing information on hundreds of thousands of pedestrian stops, vehicle stops, and arrests; and many others. Throughout our review, we were assisted by a dozen law enforcement experts from across the country with expertise on the issues we investigated.

Our investigation also relied on numerous interviews with current and former BPD officers and city officials. At all times, BPD leadership took a cooperative and professional approach to our investigation and provided important insights into the challenges facing the Department. We met at length with current Commissioner Kevin Davis, former Commissioner Anthony Batts, and leaders throughout the BPD command structure. We visited each of BPD's nine police districts, where we met district leadership and spoke with line officers. We also accompanied line officers on dozens of ride-alongs that took place in every district. Line officers shared many key insights during these ride-alongs and other interviews. We are grateful for their candor in discussing the serious challenges they face and their genuine interest in preventing the types of issues discussed in our findings. We are likewise grateful to the leadership of the Baltimore Fraternal Order of Police, which met with us on multiple occasions and invited us to speak to union members at a lodge dinner. The Vanguard Justice Society similarly invited us to speak with their members and provided highly relevant information. To gain the broadest possible perspective on the challenges facing BPD, we also met with current and former officials in City government, including current and former elected officials and prosecutors from the State's Attorney's Office.

As in all of our investigations, we also met with large numbers of people in the broader Baltimore community. Our community outreach included meetings at churches and with religious leaders; meeting with advocacy and community support organizations; attending a variety of neighborhood gatherings, from formal meetings of neighborhood associations to summer barbecues; and canvassing neighborhoods on foot to collect stories about interactions with the police. We also met individually with numerous individuals who contacted us to share information. In sum, we met with more than 500 individuals during our investigation. We are extremely thankful for the many members of the Baltimore community who came forward to share information with us, even when doing so involved reliving difficult personal experiences. We are left with the firm impression that, despite the significant obstacles to restoring community trust in BPD, there is a deep desire across diverse elements of the City for a police force that is responsive, effective, and fair.

## A. BPD Makes Unconstitutional Stops, Searches, and Arrests

We find that BPD engages in a pattern or practice of making stops, searches, and arrests in violation of the Fourth and Fourteenth Amendments and Section 14141. BPD frequently makes investigative stops without reasonable suspicion of people who are lawfully present on Baltimore streets. During stops, officers commonly conduct weapons frisks—or more invasive searches—despite lacking reasonable suspicion that the subject of the search is armed. These practices escalate street encounters and contribute to officers making arrests without probable cause,[36] often for discretionary misdemeanor offenses like disorderly conduct, resisting arrest, loitering, trespassing, and failure to obey. Indeed, BPD's own supervisors at Central Booking and prosecutors in the State's Attorney's Office declined to charge more than 11,000 arrests made by BPD officers since 2010.

### 1. BPD's Unconstitutional Stops, Searches, and Arrests Result in Part from Its "Zero Tolerance" Enforcement Strategy

The pattern of constitutional violations described below result in part from BPD's "zero tolerance" enforcement strategy, dating to the early 2000s. That strategy prioritized attempts to suppress crime by regularly stopping and searching pedestrians and arresting them on any available charges, including discretionary misdemeanor offenses. Recent BPD leadership, including the two most recent police commissioners, has acknowledged some of the problems created by this zero tolerance approach to enforcement and has attempted to shift BPD's focus to a more holistic policing model with greater emphasis on building community partnerships. For example, in April 2015 BPD enacted a new policy on misdemeanor "quality of life" offenses that instructed officers that "a verbal warning and counseling is preferable to a criminal/civil citation, and a criminal/civil citation is preferable to an arrest." Despite these laudable efforts, however, the legacy of the zero tolerance era continues to influence officer activity and contribute to constitutional violations.

Indeed, many BPD supervisors who were trained under the prior enforcement paradigm continue to encourage officers to prioritize short-term suppression, including aggressive use of stops, frisks, and misdemeanor arrests. A current BPD sergeant recently endorsed this approach to policing, posting on Facebook that the "solution to the murder rate is easy. Flex cuffs and a line at [Central Booking]. CJIS code 2-0055." CJIS 2-0055 is the offense code entered for loitering arrests. Similarly, a flyer celebrating loitering arrests was posted in several BPD districts. The flyer depicted three officers from one of BPD's specialized units known as Violent Crime Impact Division, or VCID, leading a handcuffed man wearing a hoodie along a city sidewalk towards a police transport van, with the text "VCID: Striking fear into loiters [sic] City-wide." And a deployment memo posted in one of BPD's districts in the summer of 2015 likewise encouraged officers to suppress crime through "proactive enforcement," including "stop and frisk," "street level drug enforcement," "warrant checks," "foot patrol," "car stops," and "quality of life" arrests.

---

[36] As detailed in Section II(C) below, these street encounters also contribute to officers' pattern or practice of using excessive force.



VCID
Striking fear into loiters City-Wide

These influences have contributed to BPD officers making large numbers of stops, searches, and arrests, often with dubious justification. From January 2010–May 2014, BPD officers recorded over 301,000 pedestrian stops. And the true number of stops is likely far higher because BPD officers do not document stops consistently. BPD's data suggests that stops are significantly under-reported. In 2014 alone, BPD officers recorded approximately 124,000 stops, but an internal audit found that officers completed reports for only 37 out of a sample of 123 investigative stops captured on the computer-aided dispatch (CAD) system. If this audit accurately captures BPD's overall rate of reporting stops in 2014, it indicates that officers made roughly 412,000 stops *that year alone*, which is more than seven times the average number of stops that BPD reported per year from 2010 to 2015. Other measures suggest that even this estimate may be conservative. BPD's 2014 audit of handgun charges that arose from stops found that officers did not complete a stop form in a single one of the 335 cases. These data are consistent with interviews and observations during the Justice Department's investigation, which revealed that many officers fill out stop reports rarely, if at all. In short, our investigation suggests that BPD officers likely make several hundred thousand pedestrian stops per year[37] in a city with only 620,000 residents.

---

[37] During this period, BPD policy required officers to record all stops on a form titled "Stop and Frisk." Some of the activity recorded by officers on this form may reflect encounters that do not require reasonable suspicion, such as

Moreover, BPD's data show that these stops are concentrated on a small segment of the City's population. From 2010–2014, BPD officers in the Western and Central Districts recorded more than 111,500 stops—roughly 44 percent of the total stops for which officers recorded a district location.[38] Yet these are the two least populated police districts in Baltimore, with a combined population of only 75,000, or 12 percent of City residents.[39] These districts include the City's central business district and several poor, urban neighborhoods with mostly African-American residents.[40] In these districts, police recorded nearly 1.5 stops per resident over a four-year period. This data reveals that certain Baltimore residents have repeated encounters with the police on public streets and sidewalks. Indeed, the data show that one African-American man was stopped 34 times during this period in the Central and Western Districts alone, and several hundred residents were stopped at least 10 times. Countless individuals—including Freddie Gray—were stopped multiple times in the same week without being charged with a crime.[41]

The data likewise indicate that these encounters produce large numbers of arrests. While a significant portion of these arrests reflect BPD's efforts to combat violent crime in Baltimore City, more than 25,000 arrests were for non-violent misdemeanor offenses for which officers have significant discretion about whether to make an arrest. BPD arrested approximately 6,500 people for disorderly conduct, 4,000 for failing to obey a police officer, 6,500 for trespassing, 1,000 for "hindering" or impeding, 3,200 for "interference," 760 for being "rogue and vagabond," and 650 for playing cards or dice. These highly discretionary offenses often are not an effective way to promote public safety and are subject to abuse. Indeed, supervisors at Central Booking and local prosecutors dismissed a significant percentage of these charges upon their initial review of arrest documents. This initial review resulted in dismissal of 1 in 6 of these highly discretionary charges. Over 20 percent of all disorderly conduct charges and 25 percent of failure to obey charges were dismissed.

Careful oversight is necessary to ensure that these frequent street encounters and arrests do not result in constitutional violations. Our investigation finds, however, that BPD has amplified the risk of constitutional violations in its street enforcement efforts by relying on inadequate policies, training, supervision, and accountability mechanisms. The Department does not collect reliable data on stops and searches, has no mechanism for identifying patterns or trends in its officers' stops,

---

voluntary social contacts and witness interviews. The large majority of stops recorded, however, appear to reflect situations in which the subject is not free to leave and reasonable suspicion is required. This conclusion stems from interviews with officers who explained that they completed a "Stop and Frisk" form only when making an investigative stop, and analysis of a sample of over 7,000 stops examined by Justice Department investigators, which revealed that 73 percent of stops involved officers detaining subjects at least long enough to complete a warrant check. The stop data discussed here thus overwhelmingly reflect stops that require reasonable suspicion. In 2015, BPD addressed this issue by changing its documentation protocols so that officers complete "citizen/police contact" forms for voluntary field interviews and a "Form 309" for investigative detentions, weapons frisks, and searches.

[38] Officers recorded district information in approximately 254,000 out of 301,000 total recorded stops.

[39] Population data on BPD's police districts was provided by the Department and was compiled from the U.S. Census Bureau's 2014 American Community Survey 5-year data.

[40] According to 2014 estimates from the U.S. Census Bureau, African Americans account for 83 percent of the population in the Central District and 96 percent in the Western District.

[41] The data show that BPD recorded stops of Freddie Gray on February 16th and 20th, 2014. The data nonetheless record only three total stops of Freddie Gray between 2010 and 2015. These records further indicate that BPD officers under-report pedestrian stops. Although BPD arrested Mr. Gray at least four times from 2010–2014 on charges stemming from street encounters, none of these arrests have a corresponding stop report in BPD's data.

searches, and arrests, and conducts little substantive review of officers' reasons for taking particular enforcement actions. Indeed, BPD has failed to take corrective action even where third parties— including local prosecutors—have identified officers who may be making stops, searches, or arrests in violation of the Constitution. As a result, the pattern or practice of constitutional violations described below has persisted for many years, undermining trust in law enforcement and impeding BPD's ability to form community partnerships that are essential to effective policing.

## 2. BPD Unconstitutionally Stops and Searches Pedestrians

The Fourth Amendment protects individuals from unreasonable seizures "when they step from their homes onto the public sidewalks." *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). Contrary to this principle, we find reasonable cause to believe that BPD officers regularly stop and search individuals who are lawfully present on Baltimore's streets, despite lacking the constitutionally-required indicia that criminal activity is afoot.

Our findings are based on statistical analysis of stop outcomes, interviews with officers and community members, complaints filed against BPD, and our review of a random sample of several hundred incident reports that officers completed for arrests that stemmed from pedestrian stops. Officers' descriptions of the underlying stops in these incident reports revealed frequent constitutional deficiencies. We were unable to systematically analyze the sufficiency of reasonable suspicion in *all* stops made by BPD officers—as opposed to the subset of stops leading to arrest— because most BPD stop reports do not describe the facts establishing reasonable suspicion for a stop.[42] By limiting our review to stops that resulted in arrest, we focused on cases where officers presumably had stronger indicia of criminality to justify a stop compared to stops in which the investigation proved fruitless. It is troubling that this review nonetheless found repeated constitutional violations during stops and searches by BPD officers.

### a. BPD Stops Pedestrians Without Reasonable Suspicion

Our investigation reveals a widespread pattern of BPD officers stopping and detaining people on Baltimore streets without reasonable suspicion that they are involved in criminal activity. This conduct violates the Fourth Amendment, which allows police officers to briefly detain an individual for investigation where the officers possess reasonable suspicion that the person is involved in criminal activity, *Terry v. Ohio*, 392 U.S. 1, 21 (1968). To satisfy this standard, officers "must be able to point to specific and articulable facts" supporting an inference of criminal activity; an "inchoate and unparticularized suspicion or hunch" is insufficient. *Id.* at 27.

*Terry*'s particularity requirement is not satisfied where an officer deems a person to be acting suspiciously but fails to explain the specific basis of that suspicion. The police "must do more than simply label a behavior as suspicious to make it so"; rather, the police must also be able to . . . articulate why a particular behavior is suspicious" *United States v. Massenburg*, 654 F.3d 480, 491 (4th Cir. 2011) (citations and internal quotation marks omitted). Standing alone, an individual's unexplained presence in a high crime area is not sufficient to establish reasonable suspicion. *Illinois*

---

[42] As explained further below, the failure to capture the facts supporting reasonable suspicion on stop forms also precludes BPD supervisors from substantively reviewing the basis for stops and correcting officer behavior, where necessary.

*v. Wardlow*, 528 U.S. 119, 124 (2000) (citation omitted); *United States v. Slocumb*, 804 F.3d 677, 682–83 (4th Cir. 2015) (finding that officers lacked reasonable suspicion to stop a man who was present in a high crime area late at night, acting nervously, and conducting himself in a way that seemed "inconsistent" with his stated reasons for being at the location). Nor is an individual's decision to move away from police "in a normal, unhurried manner." *United States v. Sprinkle*, 106 F.3d 613, 617–18 (4th Cir. 1997) (officers lacked reasonable suspicion to stop individual who covered his face with his hand to conceal his identity and drove away from police at normal speed); *cf. United States v. Bumpers*, 705 F.3d 168, 175–76 (4th Cir. 2013) (finding reasonable suspicion where an apparent trespasser in high crime area "dodge[d] the police" by "walking away 'at a fast pace'"). Notwithstanding these requirements, officers may always approach individuals to make social contact and ask them to answer questions voluntarily. The cases discussed in this section involve situations in which BPD officers' descriptions of an encounter indicate that the person stopped was not free to leave and reasonable suspicion was therefore required.

BPD officers routinely violate these standards by detaining and questioning individuals who are sitting, standing, or walking in public areas, even where officers have no basis to suspect them of wrongdoing. The lack of sufficient justification for many of BPD's pedestrian stops is underscored by the extremely low rate at which stops uncover evidence of criminal activity. In a sample of over 7,200 pedestrian stops reviewed by the Justice Department, only 271—or 3.7 percent—resulted in officers issuing a criminal citation or arrest. Expressed a different way, BPD officers did not find and charge criminal activity in 26 out of every 27 pedestrian stops. Such low "hit rates" are a strong indication that officers make stops based on a threshold of suspicion that falls below constitutional requirements. *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 575 (S.D.N.Y. 2013) (finding that a hit rate of 12 percent in pedestrian stops indicated that the stops were not supported by reasonable suspicion).

Despite the low rate of stops uncovering evidence of crimes, BPD supervisors often direct officers to make frequent stops as a crime suppression technique. Many of the unlawful stops we identified appear motivated at least in part by officers' desire to check whether the stopped individuals have outstanding warrants that would allow officers to make an arrest or search individuals in hopes of finding illegal firearms or narcotics. *Cf. Utah v. Strieff*, 579 U.S. __, slip op. at 8 (June 20, 2016) (holding that search incident to arrest was valid based on the discovery of an arrest warrant, even when the initial stop was unconstitutional, because "the stop was an isolated instance of negligence" and there was "no indication that this unlawful stop was part of any systemic or recurrent police misconduct"); *see also* 579 U.S. __, slip op. at 10–11 (Sotomayor, J., dissenting) (warning that police may make unlawful stops in hopes of uncovering outstanding warrants, subjecting individuals to "humiliations" and "indignity").[43] Indeed, where individuals lack identification allowing officers to check for warrants, officers sometimes detain and transport them to booking facilities to check their identification via fingerprinting—an unconstitutional detention even where officers have reasonable suspicion to make the initial investigative stop. *See, e.g., United States v. Zavala*, 541 F.3d 562, 579–80 (5th Cir. 2008) (90-minute detention in which subject was handcuffed, placed in a police car, and transported to different location "morphed from a *Terry* detention into a de facto arrest").

---

[43] Consistent with this concern, BPD officers indicated that they conducted a warrant check in 73 percent of all pedestrian stops the Justice Department analyzed—including many stops that lacked reasonable suspicion.

Officers' own reports describe this facially unconstitutional conduct. For example, an officer in the Northeast District noted in an incident report that he observed a 22-year-old African American male walking through an area "known to have a high rate of crime and [drug] activity." After watching the subject turn into an alley, the officer—despite possessing no specific information indicating that the man was involved in criminal activity—stopped and questioned him. The officer's report does not identify any evidence of wrongdoing uncovered during the *Terry* stop. Nonetheless, the report explains that the officer transported the man to BPD's Northeast District headquarters to "properly identif[y]" him because the subject "was reluctant to give any information about himself or his actions." After this custodial detention likewise uncovered no evidence of wrongdoing, the subject was finally released. This stop lacked reasonable suspicion at the outset, far exceeded the temporal limits even for valid *Terry* stops, *see infra* at 39, and violates BPD's policy requiring officers to contact supervisors when a *Terry* stop lasts for more than 20 minutes. But a BPD supervisor nonetheless signed off on the incident report describing this unlawful stop and detention.

In some cases, unconstitutional stops result from supervisory officers' explicit instructions. During a ride-along with Justice Department officials, a BPD sergeant instructed a patrol officer to stop a group of young African-American males on a street corner, question them, and order them to disperse. When the patrol officer protested that he had no valid reason to stop the group, the sergeant replied "Then make something up." This incident is far from anomalous. A different BPD sergeant posted on Facebook that when he supervises officers in the Northeast District, he encourages them to "clear corners," a term many officers understand to mean stopping pedestrians who are standing on city sidewalks to question and then disperse them by threatening arrest for minor offenses like loitering and trespassing. The sergeant wrote, "I used to say at roll call in NE when I ran the shift: Do not treat criminals like citizens. Citizens want that corner cleared." Indeed, countless interviews with community members and officers describe "corner clearing" scenarios, in which BPD officers stop, question, disperse, or arrest individuals in public areas based on minimal or no suspicion of highly discretionary offenses.

Such unlawful stops erode public confidence in law enforcement and escalate street encounters, sometimes resulting in officers deploying unnecessary force or committing additional constitutional violations. For example, on a cold January evening in 2013, an officer approached and questioned an African-American man crossing the street in a "high crime area" while wearing a hooded sweatshirt. The officer lacked any specific reason to believe the man was engaged in criminal activity, but, according to the incident report prepared by the supervisory officer on the scene, the officer "thought it could be possible that the individual could be out seeking a victim of opportunity."[44] This unsupported speculation furnishes no basis to conduct a stop. Nonetheless, multiple officers questioned the man and seized a kitchen knife that the man acknowledged carrying.

---

[44] To justify the stop, officers also noted that the man put his hands in the pockets of his sweatshirt as they approached. However, given that the encounter occurred on a cold January evening and officers observed the man "shivering," placing hands inside a sweatshirt adds minimally, if at all, to any objective suspicion the officers possessed. *See United States v. Burton*, 228 F.3d 524, 529 (4th Cir. 2000) (holding that where suspect refused to speak with police or remove his hand from his pocket, "something more is required to establish reasonable suspicion that criminal activity is afoot"); *United States v. Patterson*, 340 F.3d 368, 370–72 (6th Cir. 2003) (holding that officers lacked reasonable suspicion where suspect placed hands in his pockets and walked away from police); *United States v. Davis*, 94 F.3d 1465, 1468–649 (10th Cir. 1996) (holding that officers lacked reasonable suspicion to stop a known gang member who ignored officers' orders to take his hands out of his pockets).

When the man asked the officers to return his knife, the officers ordered the man to sit down and then forced him to the ground when the man "persisted to ask for his knife." The man yelled "you can't arrest me" and resisted his detention. Although there was no basis to detain the man, two officers attempted to handcuff and shackle him, while one officer struck him "in the face, ribs, and back" with fists. The man continued to resist being shackled as additional officers arrived, one of whom tased the man twice to prevent him from "escap[ing] the scene." After officers handcuffed the man, they transported him to Union Memorial Hospital for medical care. The man was not charged with any offense. The sergeant who responded to the scene confirmed that the involved officers tased the man twice and hit him in the face with their fists, yet the sergeant's report of the incident concluded that the "officers showed great restraint and professionalism."

In sum, we find that BPD officers frequently stop pedestrians on Baltimore streets without reasonable suspicion that they are engaged in criminal activity. This pattern is evidenced by the extremely low rate at which BPD's investigative stops yield evidence of criminality and officers' own descriptions of their conduct. The frequency of these unlawful stops subjects certain Baltimore communities to repeated constitutional harms.

### b. BPD Searches Individuals During Stops Without Legal Justification

During pedestrian and vehicle stops, BPD officers regularly escalate encounters by conducting unlawful searches. This practice includes two types of conduct: (1) officers conducting weapons pat downs or "frisks" where they lack reasonable suspicion that a subject is armed and dangerous; and (2) pre-arrest strip searches in public areas. Both types of conduct result from systemic deficiencies in policy, training, and oversight.

### i. Unconstitutional Frisks

BPD officers commonly frisk people during stops without reasonable suspicion that the subject of the frisk is armed and dangerous. This practice contravenes the principle that "before an officer places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so." *United States v. Powell*, 666 F.3d 180, 185 (4th Cir. 2011) (citation and internal quotation marks omitted). Before frisking a person stopped on the street or in a vehicle, officers must have reasonable suspicion—based on specific, particularized information— that a person is armed and dangerous. *See, e.g., Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009). This requirement is distinct from the justification needed to make the underlying stop. *See Powell*, 666 F.3d at 186 n.5 (noting that the justification for making a stop "differs from . . . whether a lawfully detained person may be armed and dangerous and thus subject to a *Terry* frisk"). The assessment of reasonable suspicion to frisk is based on the totality of the circumstances; it is insufficient, standing alone, that a subject has a prior record of arrests for violent charges, *id. at* 184–86, was stopped in a high crime area, *Maryland v. Buie*, 494 U.S. 325, 335 (1990), or was stopped late at night, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 163 (1972). Where reasonable suspicion to conduct a frisk exists, officers must limit the scope of the search to a pat down of "the outer layers of the suspect's clothing." *United States v. Holmes*, 376 F.3d 270, 275 (4th Cir. 2004). Once an officer establishes that a person is not armed, "that officer exceeds the permissible scope of a *Terry* frisk if he continues to search the suspect." *United States v. Swann*, 149 F.3d 271, 274–75 (4th Cir. 1998); *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) (an officer exceeds the scope of a permissible frisk by

"squeezing, sliding and otherwise manipulating the contents of defendant's pocket" after determining that the pocket did not contain a weapon) (citation and internal quotation marks omitted).

Yet for many years, suspicionless frisks have been a common feature of BPD's street enforcement efforts. Officers and community members told Justice Department investigators that frisks—often made under the guise of "officer safety" but without identifying any specific basis for believing that a person is armed—are a common feature of BPD's stops. Officers' own descriptions of frisks in their incident reports support this conclusion. For example, on a spring evening in 2010 officers responded to a call complaining that drug sales were occurring at a particular location. Officers arrived at the scene and observed several African-American individuals "standing and sitting at the location." Absent information that these individuals were armed or otherwise dangerous, the officers nonetheless approached and immediately frisked them. Officers disclosed the frisk in an incident report, explaining that they performed the frisk "for officer safety." Although the officers provided no information that suggested the individuals were armed or dangerous, BPD supervisors signed off on the report. Our review of incident reports and interviews with several hundred community members indicate that the unconstitutional frisk practice is widespread. We were unable to precisely quantify the scope of these unconstitutional frisks, however, because BPD does not reliably record when officers conduct a frisk.

BPD's misapplication of the *Terry* frisk standard subjects Baltimore residents to embarrassing invasions of privacy and needlessly escalates encounters with law enforcement. In one typical case, a BPD officer unlawfully frisked an African-American man after a traffic stop for driving with headlights off. Because the driver "looked nervous" as the officer approached, the officer ordered the driver and his passenger to exit the vehicle and stand on the side of the road. The officer then frisked the passenger, which included a public pat down of the passenger's groin. The officer identified no basis for frisking the passenger other than the *driver's* "nervous" appearance—far short of the required showing of particularized facts pointing to the presence of a weapon. *See Powell,* 666 F.3d at 183, 185, 187 (no reasonable suspicion to frisk man during a vehicle stop for a burned out light even where officers had information that the man had prior arrests for armed robbery). In another incident, an officer approached an African-American man walking on a sidewalk in November 2010 in an area the officer stated was "known for violent crime and narcotics distribution." When the officer "attempted to interview him about his activities," the man fled. According to the report the officer filed the day of the incident, he chased the man and deployed his taser because the man "refused to comply with my orders to stop." The taser prongs hit the man on the back but failed to stop him. As the chase continued, the officer reloaded his taser cartridge and again fired probes into the fleeing man's back. After catching up with the man, the officer used his taser yet again—this time in drive stun mode—detained the man for investigation, and conducted a weapons frisk. The report provides no reason to believe the man was armed.[45] The frisk and investigation found no weapon or other evidence of wrongdoing. The man—after being tased multiple times, taken to the ground, and frisked—was released without charges.

---

[45] More than a month later, the officer filed a supplemental report claiming that he "decided to frisk [the man] based on my suspicion that he was armed," citing the man's presence in a high crime area, his loose clothing, the fact that he "looked back over his shoulder," and that the man ran past a dumpster where he could have theoretically discarded a weapon or narcotics.

Even where BPD officers properly initiate a frisk based on reasonable suspicion that a person is armed or dangerous, we found instances in which the scope of those frisks exceeded the brief pat down of the "outer layers of the suspect's clothing" that *Terry* prescribes. *See, e.g., Holmes*, 376 F.3d at 275. While "[a]n officer is not justified in conducting a general exploratory search for evidence under the guise of a stop-and-frisk," *United States v. Brown*, 188 F.3d 860, 866 (7th Cir. 1999) (citing *Dickerson*, 508 U.S. at 378), BPD officers commonly frisk individuals in a way that seems intended to find small packages of narcotics rather than weapons. In cases reviewed by the Justice Department, officers reached inside of subjects' clothing, asked subjects to remove articles of clothing, and squeezed pockets to detect small bags that may contain illegal drugs.

### ii. BPD Conducts Unconstitutional Strip Searches

In addition to impermissible *Terry* frisks, our investigation found many instances in which BPD officers strip-searched individuals without justification—often in public areas— subjecting them to humiliation and violating the Constitution. Strip searches are "fairly understood" as "degrading" and, under the Fourth Amendment, are reasonable only in narrow circumstances. *Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, 375 (2009). Strip searches are never permissible as part of a pre-arrest weapons frisk. *See Holmes*, 376 F.3d at 275 (weapons frisks must be limited to the outer layers of a suspect's clothing). Following a lawful arrest, the reasonableness of a strip search turns on "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Absent specific facts indicating that an arrestee is concealing a weapon or contraband, officers may not strip search a person incident to arrest for an offense that is not "commonly associated by its very nature with the possession of weapons or contraband." *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981). Moreover, courts have "repeatedly emphasized the necessity of conducting a strip search in private." *Amaechi v. West*, 237 F.3d 356, 364 (4th Cir. 2001) (finding strip search unreasonable where it was conducted in public view). BPD policy likewise recognizes that strip searches should be conducted only "under very limited and controlled circumstances" and that "strip searching . . . [] suspects in public view or on a public thoroughfare is forbidden."

Nevertheless, our investigation found that BPD officers frequently ignore these requirements and strip-search individuals prior to arrest, in public view, or both. Numerous Baltimore residents interviewed by the Justice Department recounted stories of BPD officers "jumping out" of police vehicles and strip-searching individuals on public streets. BPD has long been on notice of such allegations: in the last five years BPD has faced multiple lawsuits and more than 60 complaints alleging unlawful strip searches. In one of these incidents— memorialized in a complaint that the Department sustained—officers in BPD's Eastern District publicly strip-searched a woman following a routine traffic stop for a missing headlight. Officers ordered the woman to exit her vehicle, remove her clothes, and stand on the sidewalk to be searched. The woman asked the male officer in charge "I really gotta take all my clothes off?" The male officer replied "yeah" and ordered a female officer to strip search the woman. The female officer then put on purple latex gloves, pulled up the woman's shirt and searched around her bra. Finding no weapons or contraband around the woman's chest, the officer then pulled down the woman's underwear and searched her anal cavity. This search again found no evidence of wrongdoing and the officers released the woman without charges. Indeed, the woman received only a repair order for her headlight. The search occurred in full view of the street, although the supervising male officer

claimed he "turned away" and did not watch the woman disrobe. After the woman filed a complaint, BPD investigators corroborated the woman's story with testimony from several witnesses and by recovering the female officer's latex gloves from the search location. Officers conducted this highly invasive search despite lacking any indication that the woman had committed a criminal offense or possessed concealed contraband. The male officer who ordered the search received only a "simple reprimand" and an instruction that he could not serve as an officer in charge until he was "properly trained."

An African-American teenager recounted a similar story to Justice Department investigators that involved two public strip searches in the winter of 2016 by the same officer. According to the teenager, he was stopped in January 2016 while walking on a street near his home by two officers who were looking for the teenager's older brother, whom the officers suspected of dealing narcotics. One of the officers pushed the teenager up against a wall and frisked him. This search did not yield contraband. The officer then stripped off the teenager's jacket and sweatshirt and frisked him again in front of his teenage girlfriend. When this search likewise found no contraband, the officer ordered the teenager to "give your girl your phone, I'm checking you right now." The officer then pulled down the teenager's pants and boxer shorts and strip-searched him in full view of the street and his girlfriend. The officers' report of the incident disputes this account, claiming that they did not conduct a strip search and instead recovered narcotics from the teenager during a consensual pat down. No narcotics were ever produced to the teenager's public defender, however, and the State's Attorney's Office dismissed the drug charges for lack of evidence. The teenager filed a lengthy complaint with BPD describing the incident and identifying multiple witnesses. The teenager recounted to us that, shortly after filing the complaint, the same officer approached him near a McDonald's restaurant in his neighborhood, pushed the teenager against a wall, pulled down his pants, and grabbed his genitals. The officer filed no charges against the teenager in the second incident, which the teenager believes was done in retaliation for filing a complaint about the first strip search.

Other complaints describe similar incidents in which BPD officers conduct public strip searches of individuals who have not been arrested. For example, in September 2014, a man filed a complaint stating that an officer in the Central District searched him several days in a row, including "undoing his pants" and searching his "hindquarters" on a public street. When the strip search did not find contraband, the officer told the man to leave the area and warned that the officer would search him again every time he returned. The man then filed a complaint with Internal Affairs and identified the officer who conducted the strip search by name. When Internal Affairs investigators pressed the man to provide a detailed description of the officer, the man recalled that the officer "had red patches with sergeant stripes" on his uniform. The investigator recognized this description as patches worn by the officer in charge of a shift and confirmed that the officer named by the man was working as an officer in charge in the Central District on the dates the man alleged he was strip-searched. Internal Affairs nonetheless deemed the complaint "not sustained" without further explanation.

Deficient oversight and accountability has helped perpetuate BPD's use of unlawful strip searches. Although the Department's policy limits strip searches to specific, narrow circumstances following an arrest, BPD supervisors have failed to ensure that officers comply with this policy and internal affairs officials have not adequately investigated frequent complaints that officers violate it.

BPD does not separately categorize or track complaints alleging unlawful strip searches. But our manual review of BPD's Internal Affairs database revealed more than 60 such complaints in the last six years—only one of which was sustained. In response to dozens of other strip search complaints, IA has deemed them "administratively closed," classified them solely for "administrative tracking," or found them not sustained – after minimal, if any, investigation. For example, in 2015 an African American man filed a complaint stating that he was strip-searched by an officer whom BPD eventually fired in 2016 after numerous allegations of misconduct. The man stated that the officer ordered him out of his vehicle during a traffic stop and searched the vehicle without the man's consent. When the stop of the vehicle did not uncover contraband, the officer pulled down the man's pants and underwear, exposing his genitals on the side of a public street, and then strip-searched him. The officer seized marijuana and cash during the strip search and allegedly told the man that the officer would return his money and drugs if the man provided information about more serious crimes. The complaint stated that when the man did not provide this information, the officer arrested him and turned over only part of the confiscated money, keeping more than $500. Despite the serious charges in this complaint and the officer's lengthy record of alleged misconduct, IA deemed it "administratively closed" without interviewing the complainant. This type of inadequate oversight has allowed BPD's unlawful strip search practice to continue.

### 3. BPD Makes Unconstitutional Arrests

Our investigation likewise found reasonable cause to believe that BPD's approach to street-level crime suppression has contributed to officers making thousands of unlawful arrests over the past five years. This pattern has three main components: (1) warrantless arrests made without probable cause in violation of the Fourth Amendment; (2) arrests for minor offenses, such as failure to obey and trespassing, in circumstances that violate the Due Process Clause's requirement to provide fair notice of prohibited conduct; and (3) investigative detentions that exceed the limits of *Terry* and constitute arrests.

#### a. BPD Arrests Individuals Without Probable Cause

The Fourth Amendment requires that arrests be supported by probable cause. *See, e.g, Dunaway v. New York*, 442 U.S. 200, 207–13 (1979); U.S. CONST. AM. IV. Probable cause requires "a probability or substantial chance of criminal activity" and is evaluated by examining "the totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). It "require[s] . . . the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (internal quotations omitted). Police may satisfy the probable cause requirement by obtaining a warrant prior to arrest or determining that probable cause exists in the field. *Gerstein v. Pugh*, 420 U.S. 103, 113–14 (1975). Our investigation determined that, when BPD officers make arrests in the field without a warrant, they often do so without probable cause.

Data maintained by the State of Maryland shows that, from November 2010–July 2015, BPD made thousands of arrests that reviewing officials declined to charge. The State's data records information about each person arrested, the arresting agency, all charges levied, and whether reviewing officials found that the charges were adequately supported. This data captures several stages of review of officers' justification for each arrest. When a BPD officer makes a warrantless arrest and brings the arrestee to Central Booking, a supervisor at booking determines whether to

commit the arrestee into jail; release the arrestee on bond, on their own recognizance, or with a citation; or to nullify the arrest and release the arrestee without charge. For all cases except where an arrestee is released without charge, a representative from the State's Attorney's Office then conducts an initial review of the charging documents to ensure that they recite probable cause. This review usually occurs the same day as the arrest and looks only at the officer's stated justification for the arrest, not evidence from any other source. In some cases, the State's Attorney's review finds that an arrest lacks probable cause or otherwise should not result in filed charges.

Analysis of this data reveals that, from November 2010–July 2015, supervisors at Central Booking released 6,736 arrestees without charge. Prosecutors from the State's Attorney's Office declined to charge an additional 3,427 cases, explicitly finding that 1,983 of the underlying arrests lacked probable cause. In sum, BPD officers made 10,163 arrests that authorities immediately determined did not merit prosecution—an average of roughly 200 arrests per month.

BPD's pattern of making arrests without probable cause is most pronounced with non-felony offenses that stem from street encounters between officers and residents. For example, during the last five years prosecutors and booking supervisors rejected 1,350 disorderly conduct charges—20 percent of the total. Arrests for other highly discretionary, non-violent offenses were nullified at even higher rates. Officials rejected 24 percent of disturbing the peace charges, 23 percent of failure to obey charges, and 24 percent of hindering charges. Officials likewise rejected 156 trespassing charges, comprising roughly 5 percent of the total. And these numbers almost certainly understate the extent of BPD's problematic arrests, as they reflect only cases dismissed during preliminary review based on facial deficiencies in officers' reports, not arrests later shown to be invalid during pretrial hearings or at trial.

Indeed, our review of a random sample of 150 incident reports describing the probable cause for these discretionary arrests found that officers frequently recite facially inadequate justifications. In particular, these reports reveal that officers often arrest individuals for "trespassing" where the person arrested was standing on a public street that bordered property owned by the City or a private party. Such conduct is not criminal. "[I]ndividuals in this country have significant liberty interests in standing on sidewalks and in other public places." *City of Chicago v. Morales*, 527 U.S. 41, 54 n.19 (1999) (quoting Brief for the United States as Amicus Curiae 23).

Several examples highlight this pattern. In June 2011, an officer dispatched in response to suspected drug sales observed an African-American male fitting the basic description of one of the suspects. The officer wrote in his report that the suspect was standing on a public street "in front of" property owned by "the mayor and city council of Baltimore City." When the officer approached, the man "became nervous and could not provide a valid explanation for being at this location." Lacking any further evidence suggesting that the man was involved in narcotics sales or other criminal activity, the officer nonetheless transported the man to the Western District headquarters for "debriefing" and then to Central Booking, where the man was charged with trespassing. The man was not charged with any other offense, and the officer's account of the encounter furnishes no basis for the trespassing arrest. Rather, it shows that the man was merely standing lawfully on a public street. In January 2010, officers similarly approached a man who was "standing in front of 1524 Mount Mor Ct looking around" and who walked away when he saw officers. Officers stopped the man and arrested him when he "could not provide a valid explanation

for *being in front of* 1524 Mount Mor Ct," a part of the Gilmore Homes public housing complex. In another case, an officer arrested an African-American man observed "standing in front of 578 Orchard St." The officer's report explained that when he approached, the man "began to walk east bound on Orchard St attempting to elude the officer." The officer stopped the man and asked him "why was he *standing in front of* 578 Orchard St and if he knew the resident" who resided there. When the man replied that he did not know the resident, the officer arrested him for trespassing. The officers' accounts of these and many similar incidents describe facially unlawful arrests for conduct that is not criminal.

### b. BPD Arrests People Lawfully Present on Baltimore Streets in Violation of Due Process

BPD's application of city ordinances banning loitering, trespassing, and failing to obey an officer's order violates the Fourteenth Amendment. Citing these provisions, BPD frequently arrests people who are lawfully present on public sidewalks without providing the constitutionally required notice that they are engaging in prohibited conduct. These arrests are unconstitutional under the void-for-vagueness doctrine where they are made in circumstances that "fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Morales*, 527 U.S. at 56 (invalidating city ordinance that defined loitering as "to remain in one place with no apparent purpose."). Where conduct—like loitering—is generally lawful, police may make arrests only where the arrestees violated the ordinance knowingly. *See id.* at 57–58.[46]

Moreover, absent clear standards and an intent element, a "dispersal order itself is an unjustified impairment of liberty" and cannot form the basis of an arrest for failure to obey. *Id.* at 58. The Court of Special Appeals of Maryland has criticized BPD's application of the Baltimore's anti-loitering ordinance for precisely these reasons. *See Williams v. Maryland*, 780 A.2d 1210 (Md. Ct. App. 2001). The *Williams* court reversed a defendant's narcotics conviction after finding that the defendant's underlying arrest for loitering violated due process. The court noted that, although BPD officers claimed the man was part of a group that was impeding pedestrian traffic on a sidewalk, there was no "evidence even remotely supporting an inference of scienter" or that the defendant had notice that such conduct was illegal. *Id.* at 1217. Moreover, the court held that such notice must include a specific description of the prohibited conduct; officers could not provide sufficient notice by "[t]elling someone merely that he is 'loitering' and that if he does not move on he will be arrested." *Id.* at 1218.

The same vagueness problem exists in BPD's enforcement of trespassing statutes against individuals who are standing on sidewalks adjacent to public housing or private establishments. Indeed, a federal district court in Maryland has expressed concern about the type of highly discretionary trespassing arrests that BPD utilizes. *See Diggs v. Housing Authority*, 67 F. Supp. 2d 522, 532–35 (D. Md. 1999). There, the court enjoined enforcement of the City of Frederick's trespassing ordinance and noted that a "policy of issuing citations to persons with 'no apparent legitimate reason' for being on Housing Authority property may raise serious due process concerns in light of the Supreme Court's recent decision in *Chicago v. Morales.*" *Diggs*, 67 F. Supp. at 534 n.19.

---

[46] We do not address whether Baltimore City ordinances criminalizing loitering, failing to obey, and trespassing are facially unconstitutional.

BPD's arrests of "loiterers" for trespassing and failing to obey orders to disperse frequently fall short of these due process standards. BPD often arrests people standing on streets or sidewalks for "trespassing" when they cannot provide a reason for their presence that officers deem acceptable. Our review found numerous cases in which BPD officers arrested individuals on sidewalks near public housing complexes or private businesses simply because officers determined that the arrestees had "no legitimate purpose" or "no business" in the area—precisely the type of vague, subjective trespassing standard invalidated in *Morales*. *See* 527 U.S. at 56 (finding unconstitutionally vague a statute that permitted arrest of "loiterers" who lack an "apparent purpose"); *see also Diggs*, 67 F. Supp. 2d at 534 n.19 (questioning arrests premised on having 'no apparent legitimate reason' for being on Housing Authority property").

For example, in April 2010, BPD officers approached five African Americans sitting on a brick wall in front of a private business. Officers wrote in their report that they "approached the group to ascertain their purpose for sitting on the wall in front of this location." When the individuals responded that they "were 'just chillin,'" officers arrested them for trespassing because the men "could not give a valid purpose for being on [the property]." Officers provided no warning before arresting the men and did not charge them with any other offense. Later the same month, a different BPD officer approached "two males sitting on the steps of 110 North Fremont Ave," a street that borders a public housing complex. When the men "attempted to get up and walk away," the officer stopped them and "asked what they were doing on the property."[47] The men responded that they were "just talking." The officer then—without any warning—arrested the men for trespassing because "neither was able to provide any legitimate explanation for being on the Housing Authority property." In September 2011, a BPD officer similarly arrested a man "loitering directly beside the 2501 E. Preston Street Greater Missionary Baptist Church." The officer made the arrest after asking the man "why he was in the area" and learning that the man "had no business near the area of the [church's] steps." Each of these arrests violates constitutional due process requirements because the arrested individuals lacked notice that their apparently innocent behavior was unlawful.

We found evidence that BPD supervisors have explicitly condoned trespassing arrests that do not meet constitutional standards, and evidence suggesting that trespassing enforcement is focused on public housing developments. A shift commander for one of BPD's districts emailed a template for describing trespassing arrests to a sergeant and a patrol officer. The template provides a blueprint for arresting an individual standing on or near a public housing development who cannot give a "valid reason" for being there—a facially unconstitutional detention. Equally troubling is the fact that the template contains blanks to be filled in for details of the arrest, including the arrest data and location and the suspect's name and address, but does not include a prompt to fill in the race or gender of the arrestee. Rather, the words "black male" are automatically included in the description of the arrest. The supervisor's template thus presumes that individuals arrested for trespassing will be African American.

---

[47] Officers lacked reasonable suspicion to make the initial stop, as the men were observed only sitting on steps and then walking down a public sidewalk.

---

**Trespassing Wording**

ON **(Date)** AT APPROXIMATELY **(Time)** OFFICER JOHN DOE WAS WORKING IN A UNIFORM CAPACITY IN THE **(Address in Housing Location)** WHICH IS A HIGH DRUG TRAFFICKING AREA AND AN AREA KNOWN FOR VIOLENT CRIMES. OFFICER DOE OBSERVED A BLACK MALE LATER IDENTIFIED AS **(Name of Suspect)** (LOITERING, INVOLVED IN NARCOTIC ACTIVITY, ETC) IN THE **(Address).** OFFICER DOE THEN APPROACHED **(Suspect)** AND ASKED HIM WAS HE A RESIDENT OF THE **(Name of Development)** PUBLIC HOUSING DEVELOPMENT, WHICH HAS SIGNS POSTED "NO TRESPASSING" PLACED IN A CONSPICUOUS MANNER THROUGHOUT THE DEVELOPMENT. **(Suspect)** ADVISED OFFICER DOE THAT HE WAS NOT A RESIDENT OF **(Development)** OFFICER DOE THEN ASKED **(Suspect)** WHAT WAS HIS REASON FOR BEING ON HOUSING PROPERTY. AT THIS POINT **(Suspect)** COULDN'T GIVE A VALID REASON FOR BEING ON HOUSING PROPERTY. **(Suspect)** WAS THEN PLACED UNDER ARREST AND TRANSPORTED TO CBIF FOR PROCESSING.

---

BPD likewise makes constitutionally deficient arrests of people who fail to obey officers' unlawful orders to disperse. BPD policy requires that, prior to making such an arrest, officers warn people allegedly loitering that their specific conduct is illegal. Yet our review found that officers frequently do not provide this warning or indicate only that a person must disperse because he or she is "loitering"—an instruction that is unconstitutionally vague. *See Williams*, 780 A.2d at 1218 (due process requires more than "telling someone merely that he is 'loitering' and that if he does not move on he will be arrested."). Instead, we found numerous "failure to obey" arrests made without the required warning and premised on an officer's subjective dissatisfaction with a person's stated reason for standing or sitting on a public sidewalk.

In October 2011, for example, an officer approached a group of African-American men standing on a sidewalk "within 100 feet of Amko liquor store." All but two of the men left when the officer approached. The officer stopped the two remaining men and warned them that they were "loitering" by blocking pedestrian traffic and that they were "trespassing near a liquor store." The officer then told the men "to leave the area, to stop loitering . . . and to stop trespassing near the liquor store." When one of the men replied, "I'm not leaving, I'm going to stay and finish talking to my brother," the officer arrested him for failing to obey. The order the man failed to obey—a general instruction not to "loiter" or trespass "near a liquor store"—falls far short of the notice required to support an arrest. Similarly, in July 2011 officers approached three males standing on the sidewalk in front of Crazy John's restaurant on East Baltimore Street because they were purportedly "obstructing pedestrian traffic in a public walkway." After several warnings, the officer ordered the men to leave the area and informed them that they would be arrested if they "returned." The three men then walked away and crossed the street, where they resumed "hang[ing] out." When the officer followed the men to their new location, the men walked farther down Baltimore Street, "taunted" the officer, and then ran away. Forty minutes later, the officer saw the men walking down an adjacent street while "attempting to come back on the 400 block of Baltimore Street" and arrested them for failure to obey the order not to "return." This arrest is premised on an unconstitutionally vague order not to return to a public street for an indeterminate time period.

These and similar arrests identified by our investigation reflect BPD officers exercising nearly unfettered discretion to criminalize the act of standing on public sidewalks. Absent clear warning about the specific types of conduct that will result in such arrests, this practice fails to provide notice required by the Due Process Clause and risks arbitrary and discriminatory enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983).[48] Accordingly, these arrests are unconstitutional.

### c. BPD Unlawfully Detains Individuals for Investigation, Effectively Arresting Them Without Probable Cause

Our investigation further revealed that BPD officers unlawfully detain persons for extended periods of time—sometimes for at least several hours—without probable cause. These detentions constitute arrests and violate the Fourth Amendment. BPD does not process these detentions as arrests; instead officers use them to: (1) detain and question people suspected of crimes in hopes of uncovering evidence supporting an arrest; and (2) facilitate custodial interrogations of witnesses or other people with knowledge of suspected crimes. Neither purpose vitiates the requirement that officers must have probable cause to exceed the constitutional limits on investigative detentions.

"[D]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway*, 442 U.S. at 216; *see also Brown v. Illinois*, 422 U.S. 590, 605 (1975) (detention in a police station without probable cause "for investigation or for questioning" violates the Fourth Amendment). The Fourth Amendment likewise prohibits officers extending detentions "for the purpose of gathering additional evidence to justify the arrest." *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *see also Brown*, 422 U.S. at 605 (station house detention and questioning "in the hope that something might turn up" requires probable cause). While *Terry* allows officers to detain individuals for brief investigation where officers have reasonable suspicion that criminal activity is afoot, *Terry* stops may not "resemble a traditional arrest." *Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 186 (2004). Courts have resisted putting precise limits on the permissible duration of *Terry* stops, but have found 90-minute detentions unconstitutional. *See United States v. Place*, 462 U.S. 696, 709–10 (1983); *accord United States v. Watson*, 703 F.3d 684 (4th Cir. 2012) (investigative detention for three hours without probable cause constituted an unlawful custodial arrest under the Fourth Amendment); *Zavala*, 541 F.3d at 579–80 (90-minute detention in which subject was transported to different location constituted "a de facto arrest"); *United States v. Chamberlin*, 644 F.2d 1262, 1266–67 (9th Cir. 1980) (placing a suspect in the back of a police car for twenty minutes while the officer pursued another suspect exceeded the limits of a *Terry* stop).

While BPD does not formally document investigative detentions, we found troubling indications that BPD officers use such detentions as a regular part of investigating people suspected of criminal activity. Local prosecutors described this practice to Justice Department officials as BPD officers making arrests without probable cause on the street, then hours later deciding to "un-arrest" when detention and questioning failed to uncover additional evidence. Our review of BPD documents confirmed that BPD uses these unlawful detentions.

---

[48] Indeed, as set forth in Section II(B), *infra*, these practices have resulted in highly discriminatory outcomes.

For example, in October 2010, an officer responded to a call for suspected burglary that indicated several African-American men were using a green truck to carry away a furnace. The officer arrived on the scene and approached three African-American men who were standing around a green truck with a furnace in the back. In response to the officer's questions, one of the men stated that he was helping the other men move the furnace, which had been found in a nearby alley. The officer detained the men while he conducted a canvass of the area, which did not find any property from which the furnace could have been removed. Despite failing to identify evidence suggesting the men were involved in a burglary, the officer nonetheless placed all three men in custody and transported them to the Western District headquarters "for further investigation." While the men were held at the station, the officer reviewed a CitiWatch camera that confirmed their explanation that they moved the furnace from an alley. After detaining the men for 1 hour and 40 minutes, the officer released them. BPD records contain no indication that the men consented to their detention, much less to being detained for nearly two hours. In other cases, BPD officers have likewise stopped individuals based on reasonable suspicion, transported them to precincts for fingerprinting and further investigation, then ultimately released them more than an hour later when the investigation failed to uncover probable cause to make an arrest. *See supra*, at 29. These custodial detentions violate the Fourth Amendment, which forbids extending *Terry* stops "for the purpose of gathering additional evidence to justify [an] arrest." *Riverside*, 500 U.S. at 56; *see also Brown*, 422 U.S. at 6025 (station house detention and questioning "in the hope that something might turn up" requires probable cause).

4. **BPD's Unconstitutional Stops, Searches, and Arrests Result from a Longstanding Practice of Overly Aggressive Street Enforcement with Deficient Oversight and Policy Guidance**

BPD's pattern of making unconstitutional stops, searches, and arrests arises from its longstanding reliance on "zero tolerance" street enforcement, which encourages officers to make large numbers of stops, searches, and arrests for minor, highly discretionary offenses. This approach to street-level enforcement magnifies the importance of providing officers with robust policies and training and overseeing officer activity with comprehensive accountability systems. Yet BPD failed to collect reliable data, conducted minimal oversight of enforcement activities, and forced officers to rely on policies that provide insufficient guidance or, in several important areas, facially misstate constitutional requirements. Taken together, these deficiencies contribute to widespread constitutional violations.

a. **Baltimore Leadership Prioritized "Zero Tolerance" Crime Suppression Tactics for Many Years**

Starting in the late 1990s, Baltimore City and BPD leadership expressly adopted a policing model that embraced the principles of "zero tolerance" street enforcement. According to City and BPD leaders past and present, as well as media reports, Baltimore City based its approach in part on tactics developed by the New York Police Department and brought in consultants from NYPD's program to oversee its implementation in Baltimore.[49] As we heard from BPD officers and leaders,

---

[49] *See, e.g.,* Gerard Shields, *O'Malley is wooing zero-tolerance gurus*, BALTIMORE SUN, Oct. 2, 1999, http://articles.baltimoresun.com/1999-10-02/news/9910020227_1_jack-maple-violent-crime-police-commissioner (last accessed Aug. 5, 2016).

as well as numerous community members, the strategy involved BPD officers making widespread use of pedestrian stops and searches in a purported effort to seize guns and narcotics and deter crime. BPD supervisors encouraged officers to issue citations and make arrests for low-level "quality of life" offenses, including loitering, trespassing, disorderly conduct, failure to obey, and disturbing the peace. As part of this strategy, BPD leadership pressured officers to increase the number of arrests and to "clear corners," whether or not the officers observed criminal activity. The result was a massive increase in the quantity of arrests—but a corresponding decline in quality. Of the 100,000 arrestees that BPD processed through Central Booking in 2004,[50] more than one in five were released without charge.[51] Although our investigation did not analyze data on the number of stops and searches that took place during the same time period, it is doubtless that they far exceeded the number of arrests.

From the beginning, some community members and policymakers questioned the value of the policy, arguing that it could lead to harassment of residents without an appreciable reduction in crime. Zero tolerance enforcement made police interaction a daily fact of life for some Baltimore residents and provoked widespread community disillusionment with BPD, as well as calls from activists, former police officers, and state officials to adopt new practices. The strategy also created disillusion within the Department. According to the police union president at the time, some officers referred to the stop-and-frisk program as a "VCR detail," standing for "violation of civil rights."[52]

In June 2006, the ACLU of Maryland and the NAACP filed a lawsuit alleging that BPD was illegally arresting thousands of residents every year. The complaint asserted that BPD had not properly trained officers on the legal standard necessary to make an arrest, and had placed pressure on supervisors to bolster numbers, leading to citizens being improperly detained without probable cause. Shortly after the suit was filed, BPD began to take steps to decrease its reliance on zero tolerance policing. In the late 2000s, under Baltimore Police Commissioner Frederick H. Bealefeld III, the number of arrests, and arrestees released without charge, began to decrease.[53] In 2010, BPD and the City entered into a settlement to resolve the ACLU lawsuit, with BPD agreeing to adopt policies rejecting its former zero tolerance strategy and make changes to existing policies and procedures. The settlement established an Independent Auditor to evaluate BPD's progress toward adopting stop and arrest practices consistent with the Constitution. In 2015, BPD published a number of amended policies, including one addressing the core legal elements of quality of life offenses, in which it cautioned that verbal warnings, counseling, and citations are preferable to arrest. The policy states that arrest should only take place where the quality of life violation was committed in the officer's presence, and the officer has an objectively reasonable belief that arrest is necessary under the facts and circumstances or to otherwise protect the officer and citizens of Baltimore.

---

[50] At the time, Baltimore City had a population of approximately 650,000 residents.
[51] JUSTICE POLICY INSTITUTE, BALTIMORE BEHIND BARS 10 (2010).
[52] Gus G. Sementes, *Police step up frisking tactic*, BALTIMORE SUN, Nov. 13, 2005, http://articles.baltimoresun.com/2005-11-13/news/0511130098_1_frisking-deter-crime-police-officers (last accessed Aug. 5, 2016).
[53] JUSTICE POLICY INSTITUTE, BALTIMORE BEHIND BARS 10 (2010).

Current Baltimore Police Commissioner Kevin Davis and former Commissioner Anthony Batts have acknowledged that BPD's zero tolerance strategy damaged community relationships and created obstacles to effective policing. Both commissioners have publicly supported a more holistic policing model focused on rebuilding and leveraging community trust. Nevertheless, the practices of officers on the street have continued to reflect many of the problematic aspects of the previous strategy, resulting in a pattern of unconstitutional conduct. These problematic practices are reflected in our findings. BPD's failure to engage in meaningful change was also noted in the reports of the Independent Auditor established by the ACLU lawsuit settlement agreement. At the end of the four-year monitoring period, the Auditor determined that BPD had not reached full compliance on more than half of the conditions of the agreement. Failure to consistently and adequately report arrests and engage in meaningful oversight of street-level enforcement was, and remains, a recurring problem. All of the Auditor's reporting indicated that arrest reports for quality of life offenses did not meet the requirements of BPD departmental policies. The final report from 2014 noted that there was no systematic improvement in reporting for these offenses during the monitoring period.

One of the reasons that the intended move away from zero tolerance policing has not sufficiently curbed BPD's practice of unconstitutional street-level enforcement is a persistent perception among officers that their performance continues to be measured by the raw numbers of stops and arrests they make, particularly for gun and drug offenses. Many officers believe that the path to promotions and favorable treatment, as well as the best way to avoid discipline, is to increase their number of stops and make arrests for these offenses. By frequently stopping and searching people they believe might possess contraband, with or without requisite reasonable suspicion, officers aim to improve their statistical output, which will in turn reflect favorably in their performance reviews. During shifts observed by Justice Department investigators, patrol officers actively sought out corners to clear and indicated that they believed they were obligated to move groups of people standing on sidewalks, whether or not the individuals in the groups appeared to be engaged in criminal conduct. Several officers demonstrated a mistaken understanding of the law, expressing that a group standing in front of a business or a vacant lot was necessarily loitering or trespassing on the property.

These views are reinforced by BPD's mid-level supervisors, many of whom served in the Department during the height of the zero tolerance strategy and continue to embrace its principles. Some officers we interviewed expressed frustration with supervisory pressure to prioritize drug and gun arrests over community policing and longer, more intensive investigations. One officer acknowledged the futility of breaking up a crowd of "loiterers" because the crowd would simply relocate to a different store or corner. Yet supervisors still encourage officers to "clear corners" and engage in blanket enforcement of low-level offenses, as demonstrated by the incident discussed in Section II.A., *supra*, in which the officer's supervisor encouraged him to "make something up" in order to disperse residents who were gathered peaceably on a street corner. Other officers told us that they were denied the opportunity to work overtime because supervisors believed they did not make enough stops and arrests.

This pressure from supervisors not only contributes to constitutional violations, but can also result in poor tactical decision-making that imperils the lives of officers and innocent civilians. In one incident we reviewed, an officer observed a gathering of people talking, eating, and waiting for food outside a late-night restaurant after bars had closed. None of the people appeared to be

committing any crimes. But rather than monitoring the group or calling for backup in case of trouble, the officer decided to attempt to disperse the gathering alone. The officer reported that he decided to do this because he believed his supervisor would not be happy if he saw the area had not been cleared. As a result of his decision to clear the corner, the officer ended up in a physical altercation with a man who refused to leave. Alone and surrounded by an unfriendly crowd, the officer fired his service weapon at a man he feared was about to kick him. The bullet struck two people, at least one of whom was not involved in the incident. Despite the officer's serious tactical mistakes, reviewing supervisors did not report any errors and concluded that the officer had acted appropriately.

### b. Deficient Policies, Training, and Oversight

BPD exacerbates the risk that its aggressive street enforcement tactics will lead to constitutional violations by failing to use effective policies, training, oversight, and accountability systems. While these deficiencies are discussed in greater depth in Section III, *infra* at 128-54, several failings are particularly relevant to BPD's pattern or practice of making unlawful stops, searches, and arrests.

#### i. BPD Policies and Training Materials Do Not Equip Officers to Police Effectively and Constitutionally

Important BPD policies and training materials either misstate the law or are too vague to provide meaningful guidance to officers about operative constitutional standards. As a result, officers committed to constitutional policing are often not equipped to provide it.

For example, BPD's newly adopted order titled "Quality of Life Offenses—Core Legal Elements" from April 2015 does not accurately explain the legal requirements for making loitering arrests. The order includes a section discussing special considerations for a violation of the Baltimore City Code prohibiting loitering, but fails to mention the requirement that officers may not arrest individuals for loitering until they have been told what specific conduct is prohibited, warned that a violation of law is occurring, and still refuse to desist. As discussed above, BPD's stops policy likewise misstated the applicable legal standard until 2015 by not requiring officers to have suspicion that a person is armed and dangerous prior to conducting a weapons frisk. Other policies are insufficiently specific to provide effective guidance to officers. For example, General Order 4-94, "Strip Searches and Body Cavity Searches," requires officers to obtain a warrant in order to conduct a body cavity search "unless exigent circumstances exist to justify a warrantless search." However, the policy provides officers with no guidance about what would constitute sufficient exigent circumstances to justify an immediate, warrantless body cavity search.[54]

---

[54] Other policies related to searches and seizures, though not directly related to our findings, are similarly troubling. For example, BPD General Order J-7 (January 5, 2004), "Search and Seizure Warrants" states that "Immediate entry may be initiated if sounds, conversations or other activity coming from within the premises leads you to believe that activity is occurring which may indicate a potential threat of physical harm to police officers/occupants, evidence is being destroyed, or a suspect is escaping." However, this does not accord with constitutional requirements. Prior to "forcibly entering a residence, police officers 'must knock on the door and announce their identity and purpose.'" *Bellotte v. Edwards*, 629 F.3d 415, 419 (4th Cir. 2011) (quoting *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997)). While it is true that exigent circumstances may sometimes justify a "no-knock" entry, "police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it

had been misclassified.[123] According to data from BPD, the proportion of rape cases classified as "unfounded" by BPD has dropped dramatically since 2010; BPD's data reflected a rate of 9.6 percent of rape cases classified as "unfounded" between January 2010 and March 2016. We are concerned, however, that these statistics mask a continuing problem with BPD's understanding and application of the appropriate definitions and uses of the classification categories, as well as with its practices for identifying and reporting sexual assaults. In 2015, for example, BPD described approximately 56 percent of its rape cases as "open." Meanwhile, only 17 percent of BPD's rape cases in 2015 were closed by arrest – a rate less than half the national average for the proportion of rape cases closed by arrest. Also in 2015, according to both data and anecdotal evidence from the Baltimore City SART, only a handful of BPD's cases were closed as "unfounded;" SART data indicated a rate of 6.6 percent of rape cases classified as "unfounded" by BPD between January and September 2015, and BPD presented only a handful of cases classified as unfounded to the SART audit committee for their review. Taken in the aggregate, this data suggests that BPD is keeping the majority of its rape cases in an "open" status, thus drastically reducing the rate of its rape cases closed as "unfounded"—and creating the illusion of having made meaningful reforms to its procedures for identifying and classifying sexual assaults.

In addition, we were troubled by the fact that BPD was unable to provide us with responses to our requests for basic data about the victim and suspect population, the incidence and nature of cases of sexual assault reported to and handled by the department, and the incidence of cases of sexual assault involving BPD officers. The inability to collect and produce such data suggests to us that BPD, at present, lacks the capacity to effectively assess the effectiveness its own response to sexual assault, to identify trends in the incidence of sexual assault, both in the Baltimore community and within its own department, and to make decisions about how to adjust or improve its response to sexual assault. Particularly in light of the public attention to the serious flaws in BPD's identification, reporting, and classification of cases of sexual assault, BPD's failure to remedy its procedures for collecting and reviewing data about sexual assault represents a significant weakness in the department's handling of sexual assault.

### e. Lack of Supervisory Review

Although a supervisory review form is included as a matter of course in BPD's sexual assault case files, these supervisory review forms are almost always left blank. In the rare circumstances where the supervisory review forms are filled out, they include little information and appear to reflect a limited review of what steps have been taken in the investigation, and not an examination of the quality of the investigation or the reasoning for the outcome of the investigation. Similarly, although a "State's Attorney Contact Log" form is included as a matter of course in BPD's sexual assault case files, this form is rarely completed and, when it is filled out, contains very little information. The extremely limited nature of the information provided by the supervisory review form and State's Attorney Contact Log form raises concerns for us about the inadequate supervision and review, both within and external to the police department, of BPD's sexual assault investigations.

---

[123] Md. Coal. Against Sexual Assault, *Baltimore City Sexual Assault Response Team Annual Report* 10 (Oct. 5, 2011), http://www.mcasa.org/_mcasaWeb/wp-content/uploads/2011/11/BaltimoreCityAnnualReport_print.pdf.