# EXHIBIT B

# III. SYSTEMIC DEFICIENCIES IN BPD'S PRACTICES CONTRIBUTE TO CONSTITUTIONAL VIOLATIONS, ERODE COMMUNITY TRUST, AND INHIBIT EFFECTIVE POLICING

The constitutional violations described in our findings result in part from critical deficiencies in BPD's systems to train, equip, supervise, and hold officers accountable, and to build relationships with the broader Baltimore community. *First*, BPD fails to adequately supervise its officers. This lack of supervision manifests itself in multiple ways, including a failure to guide officer activity through effective policies and training; a failure to collect and analyze reliable data to supervise officer enforcement activities; and the lack of a meaningful early intervention system (EIS) to identify officers who may benefit from additional training or other guidance to ensure that they do not commit constitutional violations. *Second*, BPD lacks meaningful accountability systems to deter misconduct. BPD does not consistently classify, investigate, adjudicate, and document complaints of misconduct according to its own policies and accepted law enforcement standards. Indeed, we found that BPD personnel sometimes discourage complaints from being filed and frequently conduct little or no investigation—even of serious misconduct allegations. As a result, a culture resistant to accountability persists throughout much of BPD, and many officers are reluctant to report misconduct for fear that doing so is fruitless and may provoke retaliation. *Third*, BPD fails to have proper agreements in place to coordinate its activities with other agencies that are operating within its jurisdiction. *Fourth*, BPD fails to adequately support its officers through effective strategies for recruitment, retention, and staffing patterns, and does not provide them with appropriate technology and equipment. *Fifth*, BPD does not engage effectively with the community it polices. BPD's failure to use accepted community policing strategies and transparency mechanisms erodes the community trust that is central to productive law enforcement.

These systemic deficiencies impair officer safety and effectiveness and lead directly to violations of the Constitution and federal law.

## A. BPD FAILS TO ADEQUATELY SUPERVISE ITS OFFICERS' ENFORCEMENT ACTIVITIES

### 1. BPD Does Not Provide Adequate Policy Guidance and Training to its Officers

BPD's inadequate policies and training contribute to the Department's pattern or practice of constitutional violations. Clear, comprehensive, and legally accurate policies and training are essential to the proper functioning of a police department. They provide crucial guidance for officers regarding what practical steps to take to remain in compliance with departmental rules and legal requirements, allow supervisors to properly monitor and instruct officers, and provide consistent guidelines for officer discipline. Here, we find that certain BPD policies and trainings do not fulfill these functions. BPD officers thus lack sufficient guidance to ensure that their enforcement activities are effective, safe, and consistent with the constitutional rights of the people they serve. While BPD has made admirable efforts to update its policies in 2015 and 2016, some outdated and contradictory policies remain in effect, diminishing the impact of the new policies and procedures.

#### a. Deficient Policies

As we described above in our findings, critical deficiencies in BPD's policies contribute to officers violating the constitutional rights of Baltimore residents. For example, officers' frequent use of tasers to apply constitutionally excessive force is connected to the Department's failure to have any policy governing the use of electronic control weapons until 2015. BPD similarly lacked any policy on baton use—also a frequent source of constitutional violations—until 2016. The Department likewise lacked a fair and impartial policing policy until 2015, despite longstanding notice of concerns about its policing of the City's African-American population. And policy deficiencies also contribute to officers' frequent illegal stops, searches, and arrests by misstating the law on the justification required to stop or frisk individuals suspected of criminal activity. Indeed, several BPD policies do not adequately capture the current state of the law, and others provide insufficient guidance to officers to allow them to align their conduct with constitutional requirements.

Beyond these specific policy deficiencies, however, we found systemic problems with BPD's method of drafting, distributing, and implementing policies that has made it difficult for officers to understand proper procedures and adapt to changing rules. BPD fails to follow widely accepted principles in developing, distributing, and implementing new policies. The International Association of Chiefs of Police, for example, has developed a set of best practices for effective development of operational policy and procedures. Among other recommendations, these principles indicate that staff should be involved in the development of the manual and kept informed of any changes. Chief W. Dwayne Orrick, *Best Practices Guide: Developing a Police Department Policy-Procedure Manual,* International Association of Chiefs of Police, http://www.theiacp.org/portals/0/pdfs/BP-PolicyProcedures.pdf (last visited June 17, 2016). Empirical research has also suggested that officers are more likely to support and comply with policies when they have been provided opportunities to give input, and supervisors clearly explain decisions that they have made. Nicole E. Haas et. al., *Explaining officer compliance: The importance of procedural justice and trust inside a police organization*, 15 Criminology & Crim. Just. 4, 16 (Sept. 2015).

BPD does not follow these accepted methods of policy development. Instead, the Department has historically developed and published policies and amendments in a manner that officers find to be confusing and opaque. As many officers told us, the numbering system alone is a source of confusion. Generally, BPD policies have been organized with titles that included letters and numbers. During one period, however, the letter-and-number system was replaced with a system that included numbers alone. The new system only applied to newly implemented policies, however, and the majority of policies were still classified by letter-and-number. Policies from different eras are written in different formats, and often modified by annexes, memoranda, amendments, and rescissions, instead of replacing the old policy completely, making it difficult for officers to be confident that they had the current, complete policy. While the policy manual has a table of contents, there is no index, and new additions and revisions can quickly make older manuals difficult to navigate. In fact, during our investigation, BPD was unable to locate one of its own amendments to disclose to us. In short, BPD policies do not provide officers with clear guidance that can be rapidly digested and put into practice in the field. Although in early 2016 BPD made efforts to provide clearer and more effective guidance to its officers by distributing a binder of updated, core policies that each officer can use in the field, significant work remains to ensure that all of BPD's policies are clear, internally consistent, and readily available to officers.

BPD likewise fails to provide officers the opportunity to provide input on the policy as it is developed. We spoke with many officers, including supervisors and others in positions of authority, who were frustrated by the lack of input they were able to have on policy development, including the policies developed in 2016. With nearly 3,000 sworn officers and another 1,000 personnel, BPD will likely receive conflicting input in addition to the helpful ideas generated if it seeks input from officers. Without seeking this input, however, BPD fails to learn critical lessons from the field, and, as importantly, it risks alienating its officers and undermining adherence to the policies it develops. Indeed, during our interviews and ride-alongs, we found that large numbers of officers expressed a lack of confidence in the policy guidance BPD provides.

To ensure that its policies provide officers with sufficient guidance to police within the bounds of the Constitution, BPD must update its policies to make them reflect current legal requirements and develop a system to distribute and maintain policies and procedures in a way that promotes officer confidence and allows officers to use the policies effectively.

**b. Deficient Training**

Compounding the problems with policy development, BPD relies on deficient training on a broad array of substantive policing functions. This contributes to the pattern or practice of violations of the Constitution and federal law that we observed. Officers have not been properly trained on numerous important topics, from the use of force and de-escalation to stops, searches, and arrests, to how to supervise and investigate misconduct. Absent effective training on how to properly conduct these actions, it is not surprising that BPD officers frequently violate federal law when interacting with the community. Our observations of training programs, review of internal documents, and conversations with BPD personnel revealed that training deficiencies within the Department arise from foundational issues in BPD's overall approach to training. The Department has failed to establish a robust training program and lacks the basic organizational capacities, infrastructure, and support required to effectively train police officers to respond to situations that arise in law enforcement encounters.

### i. Training Has Not Been a Top Priority Within BPD

Our investigation revealed that one of the fundamental causes of the breakdown in training is the Department's indifferent attitude towards its training program. Numerous members of BPD, from line officers to command staff to training personnel, conveyed to us that training is not a priority within the Department. Indeed, BPD's former director of the Training Academy released a needs assessment in 2015 that highlighted an "internal culture of placing training second," "expectations for 'rushed' training," and "outside pressure to condense training programs" as threats to the current program. *See Baltimore Police Department Training Academy Needs Assessment* (July 2015), at 5. Unfortunately, after the training director sent the needs assessment to BPD leadership, he did not receive a response for months. He also organized three different meetings with patrol commanders to begin making changes based on the needs assessment, but no commanders attended the meetings.

We found that this lack of emphasis on training has a pervasive influence on the Department. A significant number of officers we spoke with had no training beyond Maryland's basic requirements. Officers who had furthered their training did so because of their own personal interest or ambition, often using private funds and overcoming obstacles posed by supervisors or work schedules. Rather than encouraging additional training, supervisors view training as a peripheral activity that is consistently superseded by the need to keep officers on the street. Strikingly, training personnel are also subject to being pulled from their training duties to other tasks: basic training is frequently postponed or shifted due to overtime details for training personnel, leading to the extension of time basic recruits spend at the Academy. *See id.*

Training is crucial for effective and lawful policing in Baltimore. Indeed, keeping officers on the street without proper or up-to-date training is a disservice not only to community members, but to officers because of the impact on officer safety.

### ii. BPD Lacks Basic Infrastructure to Train its Officers

The failure to invest in training infrastructure underscores BPD's failure to prioritize this critical component of effective policing. BPD lacks adequate staff to train its officers efficiently; its training facilities are outdated, ill-repaired, and often unable to accommodate modern training methods; and BPD lacks mechanisms to track officer attendance and performance to ensure that officers receive and understand the training they need to engage in safe, effective, constitutional policing.

The training academy is notably under-resourced. The program lost about two-thirds of its staff over the past three years: training staff fell from approximately 60 in 2013 to 20 currently. During the course of our investigation, thirty classes had no primary instructor. Multiple training units, including the ones responsible for supervisor training for new sergeants and lieutenants, were entirely vacant with no personnel staffing them. We also found that student-to-instructor ratios during training classes were often extremely high, undermining effective communication of the material. The Fraternal Order of Police has also highlighted this concern, noting that class sizes for new recruit training have averaged 35–50 officers. *See FOP Blueprint for Improved Policing* (July 11,

2012), at 7. Minimal staffing also poses difficulties for BPD instructors to attend outside courses to develop their training skills.

BPD training facilities are in a similarly troubling state. During the course of our investigation, we were informed that BPD has only 17 computers available to train its nearly 4,000 personnel. The buildings themselves are in disrepair: water cannot be consumed from the faucets, and the buildings often lack workable air conditioning and heating. According to the Academy's recent needs assessment:

> The decrepit state of the academy itself gives the impression of a lackadaisical and uncommitted attitude towards the necessities of training the modern police officer. Recruits, sworn personnel, visiting law-enforcement experts, and civilians get the impression that they are party to a fly-by-night, poverty-stricken department when they find themselves in a crumbling, drafty building.

*See Baltimore Police Department Training Academy Needs Assessment* (July 2015), at 12. The needs assessment additionally describes a long list of basic equipment and structures missing from training facilities, from protective headgear to mats for defensive exercises. Our observations confirmed many of these shortcomings.

Equally problematic is BPD's inability to evaluate and track officer training, thus failing to properly enforce training requirements. According to internal documents produced to us during the investigation, practical training exercises do not have a comprehensive evaluation tool that measures the skill and comprehension levels of students; instructors are unable to properly assess recruits' proficiency with defensive tactics or their ability to determine when situations require force; and the current curriculum lacks pre- and post-testing procedures for evaluating how training changed recruits' comprehension of relevant information. Nor is there a mechanism to track the follow-up remedial training required after a disciplinary incident. Numerous personnel conveyed that they do not have a workable tracking system for determining when officers require training or have failed to attend a class. Rather, the current system relies on a single officer updating an Excel spreadsheet with the activities of thousands of officers and formulating a training schedule. Likely due to this deficient tracking system, members of the training staff noted that they often find that officers are "missing" significant amounts of required training.

### iii. Despite Efforts to Improve Training, Much Work Remains to Fix the Program

Individuals throughout the Department have highlighted that the Department needs to significantly improve its training program. For example, in 2012, the Fraternal Order of Police's *Blueprint for Improved Policing in Baltimore* includes an entire section focused on training issues and recommendations. *See FOP Blueprint for Improved Policing* (July 11, 2012), at 6–8. More recently, BPD's July 2015 Training Academy Needs Assessment provides a program analysis, describing major issues in personnel, curriculum, equipment and structures, and budgeting. It also notes that the Academy has been working to address some of these issues. This includes topic-area trainings on, for example, the use of force, de-escalation, and understanding youth. The Academy has also begun to create training videos and providing roll-call trainings on current law, two important steps forward.

While this is encouraging, these new initiatives will not be successful without a considerable change in the overall approach to the Department's training. Much work remains, and this work will require dedication from all members of the Department to provide BPD's training programs with the necessary resources and to create an atmosphere that actively encourages training and preparation.

Three particular types of training will need significant work if the Department wants to effectively implement reforms. First, the Department lacks sufficient scenario-based training for its officers. This "real world" training is critical for building officers' skills. The FOP has also noted this deficit: according to the FOP, simulation training on real-life scenarios should be an area of focus for BPD, and officers have frequently noted that simulation training is crucial because it teaches officers how to react in situations that regularly arise. *See FOP Blueprint for Improved Policing* (July 11, 2012) at 7. Such training, especially within a defensive tactics or crisis intervention curriculum, helps students determine the most appropriate actions during law enforcement activities, such as the level of force to be used in an encounter. Fortunately, leaders in the Department have also recognized this need, but much work remains to address it.

Second, BPD's Field Training Officer, or FTO, program needs significant improvement. An effective FTO program is a critical tool for the Department to reinforce the training and values communicated to a new officer during the academy. Likewise, a poor FTO program can undermine the investment the Department has made in a recruit before that training has become ingrained. Generally speaking, BPD does not currently attract and retain the right officers for the FTO positions, and those who do become FTOs receive only one week of training. There is a dearth of qualified FTOs throughout the Department; some districts lack FTOs entirely. The importance and benefit of a strong FTO program have long been recognized. *See, e.g.*, Michael S. McCampbell, *Field Training for Police Officers: The State of the Art* (1987) (discussing research showing that FTO programs can help reduce civil liability complaints and increase a police agency's effectiveness in the community). To achieve the reforms required, BPD needs to invest in this program to ensure that the new officers it adds to the Department have a solid foundation to engage in effective and constitutional policing.

Finally, supervisor and leadership training is a critical need within the Department. Across all levels of BPD, we found that training for these positions was deficient. Our interviews revealed that many Department commanders do not have the opportunity to receive command development training, and the FOP noted a similar lack of training. *See FOP Blueprint for Improved Policing* (July 11, 2012) at 6. The Blueprint describes management training overall as "very insular," because department managers generally "stay in Baltimore." *Id.* In an agency of BPD's size, command-level and supervisory training is critical to ensuring that the values of the agency are reinforced by its leaders on a consistent, day-to-day basis. To create the type of cultural transformation required to address the constitutional violations we found, strong, capable leadership is required. Effective leadership, combined with procedural justice internal to the agency, results in officers who are more likely to behave according to agency standards when interacting with members of the community. *See, e.g. The Final Report of the President's Task Force on 21*<sup>st</sup> *Century Policing* (May 2015) at 54.

2. **BPD Does Not Adequately Supervise Officers or Collect and Analyze Data on their Activities**

Serious deficiencies in BPD's supervision of its enforcement activities, including through data collection and analysis, contribute to the Department's failure to identify and correct unconstitutional policing.

a. **BPD Does Not Effectively Use Data to Oversee Officer Activity**

BPD fails to collect and record important data on a broad range of police activities, and that, when it does collect data, BPD does not use the data to manage and supervise officer activity. As discussed in Section II.A4, *supra*, BPD's own internal audits and other indications demonstrate that officers fail to record any information on a large portion of the stops and searches conducted on Baltimore streets, contrary to BPD's own policies and procedures. When officers do record the existence of a stop, they do not consistently record important information connected to it. We found that officers likewise often fail to report using force against individuals. And as with stops and searches, even where force is reported, officers do not consistently document important supporting information, such as statements from witnesses and other officers on the scene. These omissions violate BPD's own policy requirements. The policies and procedures are also under-inclusive, however, and do not require information to be gathered that is essential to supervise officer activity effectively.

Even where data is collected, BPD fails to store it in systems that are capable of effective tracking and analysis. Chief among the data analysis challenges is BPD's failure to use integrated systems to maintain information. Information technology officers with the Department informed us that BPD uses 232 separate databases to store information, most of which cannot link to each other. Moreover, most files do not contain unique identifiers that allow supervisors to identify and review information about a single incident that may be stored in separate databases. For example, BPD uses different programs or databases to record stops, arrests, and incident reports. The different information captured on these activities is siloed: BPD's systems do not allow a supervisor reviewing the record of an arrest or use of force that stemmed from a pedestrian stop to access the stop record that is maintained separately. BPD's failure to respond to its pattern of conducting unlawful arrests illustrates the consequences of segregating related data in unconnected systems. As explained above, Maryland maintains data on all arrests by BPD officers for which booking officers find "no probable cause" or otherwise result in prosecutors declining to bring charges. Many of these problematic arrests stem from stops, searches, or other incidents described in various BPD reports. Yet the Department lacks any mechanism to connect problematic arrests to information about the enforcement actions that precipitated them because that information is maintained in separate programs or databases. BPD supervisors thus lack critical information to correct these constitutional violations.

Moreover, BPD conducts minimal pattern analysis of officer activities. The Department does not generate any reports or otherwise track patterns in officers' stops, searches, arrests, uses of force, or community interactions. For example, supervisors do not have access to information about how frequently officers search suspects during stops, the proportion of stops and searches that find weapons or contraband, how often stops or arrests lead to officers using force, or how

often arrests lead to charges being dismissed. Because the Department does not track these activities, it lacks information to assess the effectiveness of its policing strategies and resource utilization.

BPD's inadequate data collection and analysis reflects broader deficiencies relating to officer supervision that allow constitutional violations to go uncorrected. As explained throughout our findings on stops, searches, arrests, and uses of force, supervisors conduct minimal substantive review of officers' justifications for these activities. A number of supervisors informed us that they view their role as "documenting" activity rather than assessing whether the activity conformed to policy, or that they believe internal affairs—not direct supervision—is the appropriate vehicle for assessing whether an enforcement action meets policy or constitutional requirements. Indeed, our review did not identify a single stop, search, or arrest that a front line supervisor found to violate constitutional standards—even though numerous incident reports for these activities describe facially unlawful police action. Supervisory review of officers' use of force is similarly limited. As explained further in Section II.C.5, *supra*, the Department sustained only one excessive force complaint that came from internal channels between 2010 and 2015, despite the over 2,800 uses of force that BPD recorded during that time period. These failures are compounded by the data collection and analysis deficiencies highlighted above. Supervisors lack important information about the activities and effectiveness of officers under their command.

BPD's failure to implement systems to collect and analyze data undermines not only BPD's ability to supervise its own activities, but also the ability of City leadership and the community to review the activities of their own police force. The lack of data and data analysis renders BPD opaque to any external entity, making it difficult to ascertain whether BPD is policing in a manner that accords with the priorities of City leadership or the communities BPD serves. BPD must institute more effective data management, so that it can be accountable to its community and leadership.

### b. BPD Does Not Use an Adequate Early Intervention System

Related to BPD's failure to supervise its officers and collect data on their activities, the Department lacks an adequate early intervention system, or EIS, to identify officers based on patterns in their enforcement activities, complaints, and other criteria. An effective early intervention system allows sergeants, lieutenants, and commanders to proactively supervise the officers under their command and to continually assess officers' risk of engaging in problematic behavior. EIS is a forward-looking tool that helps supervisors interrupt negative patterns before they manifest as misconduct or unconstitutional activity. Likewise, early intervention systems help supervisors recognize positive patterns that should be encouraged. BPD's EIS does not achieve these goals.

Despite BPD's longstanding notice of concerns about its policing activities and problems with its internal accountability systems, the Department has failed to implement an adequate EIS or other system for tracking or auditing information about officer conduct. Rather, BPD has an early intervention system in name only; indeed, BPD commanders admitted to us that the Department's early intervention system is effectively nonfunctional. The system has several key deficiencies. First, BPD sets thresholds of activity that trigger "alerts" to supervisors about potentially problematic

conduct that are too high. Because of these high thresholds, BPD supervisors often are not made aware of troubling behavioral patterns until after officers commit egregious misconduct. Second, even where alerts are triggered, we found that BPD supervisors do not consistently take appropriate action to counsel the officer, consider additional training, or otherwise intervene in a way that will correct the behavior before an adverse event occurs. Third, critical information is omitted or expunged from the EIS that could help address officer training or support needs or help prevent future misconduct. For example, BPD expunges discipline imposed from "command investigations"—more than half of all internal investigations handled by the Department—within one year where an officer voluntarily accepts the command punishment. This expungement is problematic for officer discipline, which is not the function of EIS, but it also inhibits a functional EIS because this critical information is omitted. Together, these deficiencies impede BPD's ability to identify and interrupt patterns of behavior that may compromise safety or lead to future misconduct. Moreover, under the State Law Enforcement Officer Bill of Rights, all complaints that do not result in a sustained finding are eligible to be expunged within three years and thus no longer captured in the Department's EIS system.

It is clear that the Department has been unable to interrupt serious patterns of misconduct. Our investigation found that numerous officers had recurring patterns of misconduct that were not adequately addressed. Similarly, we note that, in the past five years, 25 BPD officers were separately sued four or more times for Fourth Amendment violations. BPD has likewise failed to identify officers in need of support through its EIS. For example, one of the officer-involved shooting files we reviewed revealed that the involved officer—who unloaded his entire magazine at a car driving toward him—had been previously involved in two other officer-involved shootings in the past five years, in addition to a long history of complaints for harassment and excessive force. When interviewed about the most recent shooting, the officer told detectives that he believed he still had post-traumatic stress related to the other shootings. Even under BPD's high EIS thresholds, the officer's conduct had triggered alerts. But based on the records we reviewed, the Department failed to respond to those alerts in a way that could have uncovered the officer's condition or otherwise allowed for an intervention. The officer was criminally charged in the shooting. BPD's lack of an effective EIS exposes officers, the Department, and the public to risk that should be avoided.

## B. BPD FAILS TO ADEQUATELY SUPPORT ITS OFFICERS

BPD fails to support its officers through effective strategies for recruitment, retention, and staffing patterns, and does not provide them with appropriate technology and equipment. The Department must address a number of internal challenges—namely, current and projected manpower shortages, and outdated technology, facilities, equipment and insufficient resources— in order to ensure that officers are adequately supported. BPD districts are short-staffed, an issue that is further complicated by challenges the Department is facing in retaining experienced officers, and in recruiting qualified cadets. Additionally, the Department's technology, equipment, and facilities are outdated, creating inefficiencies for officers and the Department, and negatively impacting the Department's relationship with the community. The Department also lacks critical resources to support officers, such as psychological counseling for officers following a traumatic incident.

First, BPD does not have a Department-wide plan to address staffing shortages in patrol; instead, each district deals with its own shortages independently. Districts address their staffing shortages by "drafting," or requiring, officers to work additional hours after their regular ten-hour shift. Officers are "drafted" to work up to an additional ten hours after their regular shift, making for, potentially, a twenty-hour day. Only one district indicated that they attempt to draft officers who are not working the following day after being drafted. Each district has crafted its own process of drafting, and there are variations in each district's procedures. The Department has, however, indicated it is in the process of creating a policy to more consistently address staffing shortages. The Department does not record, track, or assess which officers are drafted, how frequently they are drafted, or for how many hours they are drafted per day or over any period of time. Officers we spoke with consistently informed us of the serious negative impact that drafting has on their morale. Additionally, the potential negative impact that drafting has on officers' decision-making skills after working for up to twenty hours is equally troubling. It would be difficult even for officers who are well-trained and guided by proper policies – which BPD officers are not – after working fourteen to twenty hours, to exercise restraint and good judgment in their interactions with the public. It is difficult to expect ill-trained officers who are provided little to no guidance to do so in such circumstances.

It appears BPD's staffing shortage will not be resolved in the short term. We heard from officers, supervisors, and command staff that many officers join BPD to gain experience in a high-activity environment, and after three to five years, leave the Department for less-demanding and higher-paid positions with neighboring agencies. *See FOP Blueprint for Improved Policing* (July 11, 2012) at 4, 13. This is a significant drain on the Department's resources, as these experienced officers, if they remained, would be the future leaders of the Department, and critical to the success of the Department's law enforcement efforts. The Department also appears to be confronting challenges in recruiting qualified officers – it has only met a fraction of its goals for the 2016 Academy class. At least one of the Department's background check processes—its psychological testing—has been investigated for allegedly rushing those evaluations, sometimes conducting psychological evaluations for aspiring officers in as little as fifteen minutes.[124] The Department must ensure that in its efforts to recruit a sufficient quantity of officers, it does not sacrifice the quality of officers that the Baltimore community and current employees of the Department deserve.

---

[124] Kevin Rector, *Provider of mental health evaluations for Baltimore police under investigation*, The Baltimore Sun, Aug. 5, 2015 (9:23 PM), http://www.baltimoresun.com/health/bs-md-police-psych-evals-20150805-story.html.

Second, officers are also challenged by BPD's outdated technology, equipment, and facilities. The Department is hampered by significant technological infrastructure gaps and historically has underestimated the infrastructure required to implement technology. While we applaud the Department's advances, such as its commitment to equipping all officers with body-worn cameras, BPD must also ensure that it updates its technological infrastructure to support such initiatives, as necessary. Likewise, officers suffer from being supplied with outdated, broken, or in some cases, no equipment. As one officer noted to the Fraternal Order of Police in a focus group, "How am I supposed to pull someone over for having a taillight out when my car has two?" *See also FOP Blueprint for Improved Policing* (July 11, 2012) at 10. Officers have no computers in their cars, forcing them to return to the district station to type reports, and even those computers are often not working. Although the Department uses the "PocketCop" application on departmentally issued cell phones, we found that many officers did not have access to it for various reasons, and that it could not be used for many reports. This absence of technology for field-based reporting creates an additional drain on the Department's already limited resources. Taking officers off the street to type reports at the district takes away from time that could be spent on law enforcement or community building activities. It also creates inefficiencies for officers who often must write reports on paper in the field while their memories of incidents are fresh, and then type the same information into computer databases after arriving at the district station at the end of their shift.

These equipment issues not only create inefficiencies for officers and drain the Department's resources, they also negatively impact officer morale. The dilapidated state of some of the Department's district stations also lowers officer morale, and affects community relationships. The Department also lacks critical support services for officers, such as adequate psychological counseling or peer support program following a shooting or other traumatic event. Despite its budgetary issues, the City of Baltimore will need to make an investment in its public safety facilities and resources to ensure that officers have the tools necessary to properly serve the residents and businesses of the City.

## C. BPD Fails to Hold Officers Accountable for Misconduct

BPD relies on deficient accountability systems that fail to curb unconstitutional policing. For years, the Department's process of investigating and adjudicating complaints has been plagued by systemic failures, including: discouraging individuals from filing complaints; poor investigative techniques; unnecessary delays; minimal review and supervision; and a persistent failure to discipline officers for misconduct, even in cases of repeated or egregious violations. BPD likewise fails to provide information about officer misconduct in a transparent manner or receive input on the accountability process from the community it serves. As a result, a cultural resistance to accountability has developed and been reinforced within the Department. This culture further undermines accountability by discouraging officers from reporting misconduct and discouraging supervisors from sustaining allegations of it. BPD's persistent failure to hold officers accountable for misconduct contributes to an erosion of the community trust that is central to effective law enforcement.

Central to BPD's accountability systems is the Internal Investigation Division, or IID. IID investigates and resolves complaints of officer misconduct, both complaints received internally from other officers or BPD employees, and those received from members of the community. Within the IID, "Ethics" detectives investigate complaints that officers engaged in potentially criminal activity, or other allegations that, though not criminal, implicate an officer's integrity or truthfulness. "General internal affairs" detectives investigate all other allegations of serious officer misconduct, including most instances of excessive force. Outside of the IID, each of the nine patrol districts, along with each Specialized Unit within BPD's Operations Bureau, housed a "Command Investigations Unit," or CIU, until January of 2016, when the Department centralized all Command Investigation Units at the IID. Before centralization, each CIU operated independently of the other CIUs and of the IID. The CIUs investigate minor violations of BPD policy, and BPD has authorized district and unit commanders to impose minor discipline in the event an accused officer agrees to the discipline.

When IID sustains the allegations in an investigation,[125] or an officer refuses to accept discipline at the command level, the case is sent to the Office of Administrative Hearings to coordinate the drafting of administrative charges and, if necessary, to arrange disciplinary proceedings. Under the State's Law Enforcement Officer's Bill of Rights (LEOBR), officers are then entitled to an adversarial hearing, or trial board, before the Department can discipline them. At BPD, trial boards convened to adjudicate certain minor violations of BPD's command discipline policy typically consist of one person, drawn from a pool of BPD commanders. Trial boards convened to adjudicate major discipline are composed of two commanders and one BPD member of the same rank as the accused officer. If the trial board finds the officer is not guilty of violating BPD policy, that finding terminates the case and the Department cannot discipline the officer. But if the trial board finds the officer is guilty, it hears a presentation of mitigating evidence, and then recommends discipline. Ultimately, the commissioner determines the appropriate discipline, but

---

[125] When BPD completes an internal investigation, there are four possible outcomes. The Department can sustain an allegation, which means investigators found, by a preponderance of evidence, that a policy violation occurred. Allegations can be found "not sustained," which means that investigators were unable to tell either way. Allegations can be unfounded, meaning the investigator determined that the violation did *not* occur. Or allegations may be exonerated, meaning that the action alleged did occur, but that it did not violate Department policy.

may only do so if the trial board first finds the officer guilty. The commissioner may depart from the Board's recommendation and impose less or more discipline. But if the commissioner imposes greater discipline, the officer is entitled to another opportunity to be heard. The officer may then appeal any discipline imposed by the Department to the state courts in Maryland.

We found deficiencies throughout these accountability systems that undermine adherence to BPD's policies and procedures and contribute to the violations of federal law that we found.

## 1. BPD Lacks Adequate Systems to Investigate Complaints and Impose Discipline

BPD's systems for holding officers accountable are plagued by several deficiencies. We found that BPD discourages members of the public from filing complaints; improperly classifies complaints to mask misconduct; delays investigations of complaints unnecessarily; uses poor investigative techniques to gather evidence about misconduct; fails to consistently document the results of its investigations; and does not receive input from the community or share information about its investigative processes. As a result, the Department is rarely able to impose discipline for misconduct, and many officers believe that disciplinary determinations are not made fairly or consistently.

### a. BPD Discourages Members of the Public from Filing Complaints

BPD discourages members of the public from filing complaints against officers through the procedural requirements BPD has imposed on filing complaints, and BPD officers and supervisors have actively discouraged community members from filing complaints. These practices pose significant barriers to members of the Baltimore community who try to alert the Department to misconduct by its officers.

As an initial matter, BPD places unnecessary conditions on the filing of complaints. While the Department ostensibly accepts complaints made in person, by telephone, or over email, it requires complaints alleging many common types of misconduct—including excessive force, abusive language, harassment, false arrest and imprisonment—to be signed, notarized, and filed in person at one of just a few locations throughout the City.[126] Additionally, complaints alleging excessive force must be sworn under penalty of perjury. Although IID commanders we interviewed informed us that, despite these requirements, the Department investigates all complaints even if they are not notarized or submitted in person, our review of BPD's files indicated that, in practice, BPD does not investigate unless these requirements are met. For example, in 2013 an individual called BPD's internal affairs to complain about an officer who grabbed him by the neck and called him a "punk ass faggot." Although the individual gave a statement describing the incident over the phone, BPD supervisors closed the case because the complainant did not show up in person at BPD's Internal Investigation Division to "fill out a CRB form and to have his statement notarized." Indeed, the BPD investigator claimed that the man "failed to cooperate" by not submitting a notarized form. These requirements all but ensure that numerous anonymous complaints, or those received over the phone, by email, or in person at any of BPD's nine police districts, will go unexamined.

In addition, we found examples of BPD officers expressly discouraging civilians from filing

---

[126] If the complaint is made by a juvenile, the juvenile must be accompanied by an adult.

complaints, sometimes mocking or humiliating them in the process. Some civilians wishing to alert BPD to officer misconduct had to endure verbal abuse and contact BPD multiple times before investigators would move forward with any investigation. As described *supra* at 69-70, for example, BPD officers ridiculed an African-American man attempting to file a complaint that officers used excessive force and racial slurs during an arrest: when the man arrived at the district headquarters to make the complaint, officers told him, "you can take your black ass down to Kirk Avenue before the bus leaves because you know how you black people like the bus." Kirk Avenue is the location of BPD's Internal Investigation Division. In another incident, a woman alleged that a BPD supervisor flatly refused to accept a complaint that officers used excessive force when arresting her son. According to the woman, the supervisor refused to accept the complaint, telling the woman "she could not go against her officers."

To ensure that it learns about potential constitutional violations and other misconduct by its officers, and to rebuild its relationship with many of the communities it serves, BPD must reform its complaint intake procedures and make them accessible to the public.

### b. Supervisors Misclassify Complaints and "Administratively Close" Them Without Investigation

After intake of a complaint, BPD investigators frequently misclassify those complaints or administratively close them with little attempt to contact the complainant.

First, BPD investigators often inappropriately categorize complaints as minor allegations that may be resolved at the command level without IID involvement. Appropriately categorizing a complaint is critical because it affects which internal affairs component will investigate, the level of investigation undertaken, and the possible discipline imposed. BPD's policy on command discipline lists categories of cases which "may" be handled by the district, but this fails to provide guidance for officers and detectives about when cases should be referred to IID, or who is responsible for making that decision. Instead, we were told that BPD officers and IID investigators categorize complaints based on "common sense." Moreover, we found that BPD does not use its internal affairs database to consistently review how complaints are categorized, and that is its only mechanism for doing so. This process vests considerable discretion in supervisors, and we found that supervisors frequently use this discretion to classify allegations of misconduct that result in minimal investigation. Indeed, we found that the Department resolved the majority of the approximately 38,000 allegations[127] made against BPD officers from 2010 through 2015 at the command level without referral to IID, resulting in significantly less investigation. Moreover, of these 38,000 allegations, 9,694 allegations were categorized as "supervisor complaints," which, according to BPD commanders, require no investigation at all. Accordingly, allegations handled as supervisor complaints virtually never result in discipline. We found that BPD "administratively closed" 67 percent of supervisor complaints and sustained just 0.27 percent of them, or 1 out of every 370 allegations.

Many complaints that were sent to command investigations or classified as "supervisor complaints" alleged serious misconduct, including allegations that officers committed criminal assault, theft, and domestic violence. In 2014, for example, although a complaint on intake alleged a

---

[127] A single complaint may contain multiple allegations.

"sexual assault," the case was assigned to a command investigations unit and categorized as "misconduct/improper search" and "discourtesy." In 2011, a sergeant likewise misclassified a complaint alleging that that BPD officers had been harassing an African-American woman's nephew over the past month by repeatedly stopping him near their home in West Baltimore. Though the woman wished to make a complaint of harassment, the sergeant categorized the complaint as a "supervisor complaint" and closed the case without conducting any interviews of the involved officers or the woman's nephew. This is troubling, particularly given our findings that BPD officers engage in unlawful stops and discriminatory policing.

Second, even where complaints are nominally "accepted," BPD supervisors often "administratively close" them with minimal investigation. Indeed, BPD supervisors administratively closed 33 percent of all allegations received from 2010 through 2015—ensuring that the allegations would result in no further investigation or officer discipline. Administrative closures frequently occur after supervisors make only minimal efforts to contact the complainant. Some of the files we reviewed contained no indication that investigators attempted to contact complainants at all. Many other files showed that investigations languished for months before investigators made any effort to reach out, or that investigators closed cases after complainants failed to respond to a single letter, answer a phone call, or appear for a scheduled interview. By administratively closing complaints, BPD investigators evade BPD policy that requires all complaints to be labeled as sustained, not sustained, exonerated or unfounded. Some BPD officers we interviewed believed it was appropriate to administratively close a complaint when the complainant withdrew his or her complaint, or could otherwise not be reached. Others believed "complaints" that failed to allege a "real" violation of BPD policy should be administratively closed. These administrative closures, combined with BPD's failure to ensure that complaints are appropriately classified, undermine BPD's system of accountability and contributes to the perception shared by officers and community members alike that discipline is inconsistent and arbitrary.

### c. BPD Fails to Investigate Complaints in a Timely Manner or with Effective Techniques

When investigations of complaints do proceed, they are hampered from the start by poor investigative techniques and unreasonable delays. These failures limit the Department's ability to discipline its officers by preventing investigators from gathering evidence of misconduct and subjecting evidence to attack during administrative proceedings.

### i. Delays Impede Investigations

BPD's misconduct investigations are frequently plagued by delays that compromise the evidence-gathering process and undermine community confidence. As an initial matter, even when BPD nominally "accepts" an external complaint and assigns the case to an investigator, the Department's practice in most cases is to not investigate that complaint until the individual appears in person at BPD's Internal Investigation Division during business hours and participates in a formal, taped interview. By that point, key evidence that could corroborate claims may be lost or destroyed. We found instances in which investigators waited months before canvassing neighborhoods in which alleged misconduct occurs. After such delays, physical evidence is often

destroyed, witnesses cannot be located, and witness memories have faded. Other important evidence, such as surveillance video, may also be unavailable.

These delays not only impede effective investigations, they communicate to the community that BPD does not take complaints seriously—even those alleging egregious officer behavior. For example, a man alleged in 2013 that two plainclothes officers punched him in the face, placed him in a chokehold, and spit in his face during an arrest. The man, whose arrest prosecutors declined to pursue, participated in a formal interview at IID during which he provided the investigator with the name of a witness to the incident, and the witness's wife, who could help investigators locate him. The investigator made no effort to follow up with the civilian witness until eight months after the incident occurred. At that time, the investigator went to the car wash where the witness's wife had been working at the time of the incident and was told by the owner that she was no longer employed there. The investigator then recommended to close the complaint as "not sustained" because "[w]ithout testimony from independent witnesses," along with the officers' denial, "there exists insufficient evidence to prove or disprove the allegations." BPD's investigation of a second 2013 complaint alleging serious misconduct suffered even longer delays. The complainant alleged he was hospitalized after two officers slammed him to the ground and unlawfully arrested him for "hindering" and failing to obey due to his refusal to leave the area while officers questioned his brother-in-law. The complaint was not investigated for thirteen months while two command investigation units sent the complaint back and forth. After the case was rediscovered after an audit of IA Pro, it lingered for another four months before a supervisor finally assigned the case to an IID detective. BPD ultimately found the complaint not sustained for "lack of cooperation" when witnesses failed to show up for interviews *seventeen months* after the complaint was filed. According to the investigative file, the Department never interviewed the accused officers.

In another egregious example, an investigator made minimal delayed attempts to look into a woman's complaint that two BPD officers fondled her when conducting a search and called her a "junkie, whore bitch." The investigator assigned to the case made no attempt to contact the woman until four months after she made these serious allegations. And at that point, the investigator merely sent the woman a certified letter seeking information. Two months later, after the letter had come back unclaimed, the investigator went to the residential address the woman had originally provided, only to discover she had been evicted months before. Moreover, the delays precluded investigators from identifying relevant video evidence. The incident occurred in a public location—the Lexington Market—that was likely captured on video surveillance. Yet the detective made no attempt to gather the footage until ten months after the incident. By that time, any video had been deleted. Investigators also waited ten months to reach out to a witness, even though the complainant had provided the witness's contact information at the time she filed the complaint. Ultimately, the investigator learned that the complainant had passed away several months before he first contacted the witness. BPD then found the complaint "not sustained."

In these and many similar cases we reviewed, unnecessary delays precluded BPD investigators from gathering important evidence about allegations of serious misconduct. Going forward, collecting and assessing such evidence in a timely manner will be a critical piece of the accountability system that BPD must build to identify officers' constitutional violations and impose appropriate discipline.

## ii. BPD Uses Ineffective Methods to Investigate Misconduct Allegations

In addition to frequent delays that limit the information available about misconduct allegations, poor investigative techniques further compromise BPD's investigations. We identified several key failures that recur throughout the Department's investigative files, including the failure to adequately consider inconsistencies in investigations, as well as inappropriate interviewing methods and notice of allegations.

First, investigators fail to adequately consider evidence and statements from witnesses or other officers that contradict explanations provided by officers accused of misconduct. Indeed, BPD appears to apply a standard that favors officers when evaluating statements made by complainants and involved officers. While BPD's Internal Affairs Manual encourages investigators to be wary of a complainant's inconsistent statements, the Department permits officers to submit addendums that clarify their original statements. And when inconsistencies arise—either from such addenda or other evidence—investigators generally discredit or discount entirely evidence contradicting the accused officer's account. We found investigations in which this took place even where the accused officer's account is contradicted by physical evidence, including photographic or video evidence.

Second, BPD investigators compromise officer interviews by failing to probe beyond reports the accused officer already provided, and performing unrecorded "pre-interviews" with accused officers. As we described in Section II.C.5, *supra* at 107, regarding force investigations, these pre-interviews compromise the integrity of an investigation. Similarly, we also found numerous instances in which officers reviewed their statement or administrative report related to the incident before the interview, and the interview then consisted merely of the accused officer orally reciting his administrative report.[128] IID investigators did not probe beyond this oral recitation. These interview techniques inhibit the function of IID investigators to obtain reliable information from officers accused of misconduct.

Third, BPD risks compromising investigations by providing accused officers with a detailed notice describing the alleged misconduct, often right after a complaint has been filed and before any investigation occurs. While LEOBR provides that officers must receive basic notice of allegations and five days to obtain counsel prior to questioning, BPD frequently notifies officers almost immediately after the Department receives a complaint.[129] This notice often takes place before a detective undertakes any investigation or even attempts to contact the complainant to set up an

---

[128] BPD officers' collective bargaining agreement provides the opportunity to review statements and reports prior to being interviewed .

[129] Until early 2016, LEOBR entitled officers to a ten day notice period to obtain counsel prior to being questioned. We note that these waiting periods prescribed by LEOBR may, in many instances, impede effective investigations, and that a similar waiting period is not afforded to members of the public who may have been involved in an incident or were witnesses to the incident. In some instances, we saw evidence that BPD required witnesses to be interviewed immediately, even while the witness's friend or family member was being taken to the hospital as a result of the incident. The best practice is to interview the officer as soon as possible. Additionally, the International Association of Chiefs of Police "opposes any special and/or additional protection for law enforcement officers. Officers' rights should be no greater than those of other private and public sector employees." LEGISLATIVE AGENDA FOR THE 114TH CONGRESS, INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE 20, http://www.theiacp.org/Portals/0/documents/pdfs/IACP114thLegislativeAgenda.pdf.

interview. Moreover, the notice specifically articulates the allegations against the officer—sometimes including the date and time of the incident in question. Providing such detailed notice at the outset of an investigation, which is not required by LEOBR, may compromise certain investigative steps and opens the possibility that a complainant may be retaliated against or intimidated prior to speaking with investigators. Indeed, the Department's own internal affairs audit identified these same potential problems in 2014. The Department nonetheless continues to use its early notification practice.

### iii. BPD Fails to Adequately Supervise Investigations

The deficiencies in BPD's investigative techniques persist in part because of ineffective supervision and training. Indeed, we found that most investigators receive no formal investigative training. Lack of training coupled with minimal supervision results in some investigators continuing to rely on poor investigative techniques. For example, one CIU detective who was responsible for all command investigations for an entire district told us that his practice was to allow accused officers to be interviewed by questionnaire—which officers could complete off-site with the assistance of their attorneys—rather than submit to in-person interviews. Although BPD formally discontinued the use of written questionnaires years ago, the practice persists because of inadequate training and oversight. Indeed, this practice has continued even after it was criticized by the Department's own internal affairs audit.

Moreover, BPD supervisors fail to identify deficiencies or questionable findings in investigations. We found that commanders consistently approve investigative findings, even where investigative files are deficient or incomplete. In our review, we found that files frequently omitted basic information, such as the outcome of the investigation or any discipline imposed. We also found key pieces of evidence referred to in the investigator's narrative—including witness statements, photographs, and video footage—were left out of the case file itself. Nevertheless, across all the case files we reviewed, we saw virtually no evidence that supervisors sent cases back for further investigation or clarification. Nor do supervisors meaningfully review investigators' determinations about whether to sustain complaints. Indeed, CIU investigators told us they were not required to have supervisors review and sign off on investigations that resulted in findings of "not sustained," although supervisors must approve an investigation that results in a finding of "sustained."

Additionally, BPD's internal affairs files and database indicate that BPD does not adequately supervise investigators to ensure that they meet investigative deadlines, especially in the command investigations units. Under LEOBR, in order to discipline an officer for misconduct, the Department must complete the internal investigation and bring administrative charges within one year. We reviewed complaints where investigators recommended closing cases because the investigations had extended past the one-year deadline. Indeed, BPD's internal affairs database itself includes possible "findings" that indicate cases were closed due to "expiration."

Finally, BPD has not taken sufficient steps to ensure that investigators do not have a conflict of interest. We found instances in which conflicts of interest could have compromised an internal investigation. For example, one internal affairs detective we interviewed told us that he had been detailed to serve under the supervision of an officer he was investigating at that time, and that the

commander knew of the investigation. This is troubling, and it communicates to officers, investigators, and the community that internal investigations are not a priority of the Department.

BPD's failure to ensure that investigations are thoroughly and fairly investigated limits its ability to hold officers accountable for misconduct. Without adequate evidence, the chances of sustaining allegations of officer misconduct are diminished. And even where allegations of misconduct are sustained, the Department's ability to marshal adequate evidence at trial board proceedings is compromised. Consequently, officers frequently do not face internal discipline even where evidence of misconduct exists.

### d. BPD Fails to Sustain Complaints and Apply Discipline Consistently

Deficiencies in BPD's complaint intake and investigation contribute to BPD's extremely low rate of sustaining allegations of officer misconduct, which in turn leads to a lack of discipline and accountability in the Department. Discipline for allegations of serious misconduct is rare. Of the 1,382 allegations of excessive force that BPD tracked from 2010 through 2015, only 31 allegations, or 2.2 percent were sustained. These allegations arose out of fourteen separate incidents. In light of the significant evidence of excessive force we found in our investigation, the low rate of sustaining excessive force complaints is troubling. Similarly, BPD completed investigations into 1,359 allegations of discourtesy from 2010 through 2015, and sustained just 2.6 percent of those allegations, arising out of just fifteen incidents. This low number of sustained outcomes is also concerning, considering the number of community members we spoke to who described BPD officers behaving in a rude or abusive manner during encounters with community members.

When complaints of misconduct are sustained, however, the trial board process that follows in order for discipline to be imposed also has several problems that impede accountability. First, the process is beset by delay. The Department reported to us, for example, that some trial boards conducted in 2015 were to resolve cases BPD began investigating in 2011. Delays of this magnitude send a message to officers that misconduct is tolerated, frustrating officers and supervisors who are trying to follow and implement Department policies and procedures. They also signal to the public, and in particular to the complainant, that officers who commit misconduct are unlikely to be held accountable.

Second, officers facing the trial board have substantial powers granted to them by LEOBR and BPD's collective bargaining agreements to shape the membership of the trial board that will hear their case, undermining accountability. Trial boards convened by BPD to adjudicate allegations of misconduct are typically composed of three officers selected from a pool determined by the commissioner. Under LEOBR, each board must include one officer who is "the same rank as the law enforcement officer against whom the complaint is filed."[130] The accused officer has the right to reject assigned Board members a total of three times through the use of peremptory strikes. The officer can exercise these strikes up to and including the day of the hearing itself, potentially dismissing all members of the board. We heard from numerous sources, including many within BPD and City leadership, that this use of peremptory strikes permits officers to assemble a trial board sympathetic to their interests, particularly because the pool of eligible command staff in the Department is limited, and because the command staff members are also part of the same union.

---

[130] Md. Code Ann., Pub. Safety § 3–107.

The Maryland legislature amended LEOBR in early 2016 to authorize jurisdictions within the state to allow up to two voting or nonvoting civilians to serve on trial boards if authorized by local law or if negotiated through collective bargaining with the police union. To date, BPD does not allow civilians to serve on the trial board.

Although BPD produced a very limited amount of information about trial board proceedings, we saw indications that the construction of the trial boards undermines confidence in the equity of the process. We requested information on all trial boards conducted between 2010 and 2015, and BPD produced only twelve transcripts of trial board proceedings, and no summaries and no written findings for the 139 trial boards the Department reported took place between 2010 and 2015, despite our request that the Department produce "all documentation" concerning trial board cases. In addition, BPD's attorneys told us the Department will only create a transcript of a trial board that results in a guilty finding if the officer challenges the discipline imposed in court. This lack of information is consistent with BPD's own assessment: according to an internal audit, BPD has historically failed to fully track information related to disciplining officers. Such minimal documentation of the trial board process prevents the Department from fully evaluating the proceedings or identifying patterns or deficiencies that may contribute to the Department's failure to discipline an officer.

This lack of consistency and fairness in imposing discipline has a profound effect on officer morale, and it also affects how officers interact with the public. Throughout our interviews and ride-alongs with officers, we heard officers express that discipline is only imposed if an incident makes it into the press or if you were on the wrong side of a supervisor, not because of the magnitude of the misconduct. Similarly, some officers felt that command staff creates an appearance of addressing problems after a high-profile incident by rushing to issue new policies, without any officer input, and often in conflict with existing policies. By BPD rushing to issue these new policies, officers felt that they were not provided with adequate training to follow the new rules, exposing them to risk even as the Department appeared to address the problem and respond to City politics. This lack of internal procedural justice—officers' sense that they are being treated fairly by their Department—diminishes officer morale and diminishes officers' adherence to Departmental rules. This, in turn, can make officers less likely to treat members of the public fairly and in accordance with BPD policies and procedures, potentially contributing to violations of federal law we found in our investigation. *See, e.g.,* Nicole E. Haas et. al., *Explaining officer compliance: The importance of procedural justice and trust inside a police organization,* Criminology & Criminal Justice, p. 14 (January 2015) (finding that "the perception of procedural justice and trust is associated with higher levels of endorsement of rules and regulations on the use of force").

### e. BPD Lacks Effective Civilian or Community Oversight

BPD's accountability system is shielded almost entirely from public view, and the civilian oversight mechanisms that are currently in place are inadequate and ineffective. These flaws damage the Department's legitimacy in the community.

Community members are unable to obtain information about BPD's complaint and discipline systems at almost every step in the process. Complainants face many hurdles in filing complaints, but once they are filed, it is difficult for complainants to obtain information about how the complaints are progressing or whether and when they will be acted upon. Indeed, even when

discipline is imposed, notice of this action is only given to a small group within the Department, not to the complainant or to the public except in unusual circumstances where the Department determines that a broader announcement of the discipline is in the public interest. Trial board proceedings have been closed to the public historically. Although they were opened to the public in early 2016, it is too early to determine what effect this has on the community's ability to affect the accountability process. The Maryland Public Information Act, or MPIA, further limits BPD's transparency to the public. The MPIA prohibits disclosure of documents that constitute "personnel records." *See* Md. Code Ann. § 10–616. The statute does not define the scope of this prohibition, but Maryland appellate courts have held that it applies to all materials related to hiring, promotions, and discipline, as well as "any matter involving an employee's status." *See, e.g., Montgomery County v. Shropshire*, 23 A.3d 205, 215 (Md. Ct. App. 2011). We heard from numerous sources that this provision has repeatedly blocked attempts to access information about the resolution of complaints and other issues of public concern related to BPD's policing activities.

In addition, Baltimore's Civilian Review Board, or CRB, has proven to be ineffective at changing this dynamic, in large part because it has never been provided with adequate authority or resources to perform its intended function. Established in 2000, the Board was meant to be a crucial check on police misconduct by providing an alternative investigative and review process. The Board is made up of civilian representatives from each of the City's nine police districts selected by the Mayor and approved by the City Counsel, along with members without voting power from local advocacy organizations and the local chapter of the Fraternal Order of Police. The Board may accept complaints that allege excessive force, abusive language, harassment, false arrest, and false imprisonment directly from the community. BPD is also required by policy to forward all complaints containing these categories of allegations to the Board. The Board may review BPD's investigations, or it may conduct an independent investigation and make recommendations directly to the commissioner that the complaint be sustained, not sustained, unfounded, or exonerated. It can also request that BPD undertake additional investigation.

The Board has faced several impediments to serving as a meaningful community backstop for accountability. First, the Board relies upon BPD to forward complaints that fall within its authority, except when a complaint is filed directly with the Board, and BPD often fails to forward complaints in a timely manner. Indeed, CRB staff members told us of cases BPD forwarded to the Board only after BPD had already closed its investigation, despite BPD's obligation to share the complaint with the Board within 48 hours of receipt. The Board has no authority to audit BPD to determine if it has received all the complaints that should have been forwarded to it. Second, the Board has insufficient resources and authority to conduct its own investigations. During 2010 to 2015, the Board only had a single investigator to investigate all the complaints that fell within its authority. The Board also cannot compel officers to participate in investigations; indeed, LEOBR provides that sworn law enforcement officers can only be "interrogated" by other sworn law enforcement officers. Finally, when the Board makes recommendations to the commissioner about investigative findings, or recommends that the IID conduct additional investigation, the Board has no way of knowing if BPD acts on its recommendations, much less requiring that BPD do so. The lack of resources and authority that the City currently invests in the Board render it ineffective, heightening community perceptions that BPD is resistant to accountability.

We note that we are encouraged that the Civilian Review Board was recently able to hire several new staff members, and is now coordinating a new mediation initiative for police and community members. Although these are steps in the right direction, the Board will still be unable to fulfill its mission if it is not granted more authority and supported with adequate resources to perform its duties.

## 2. BPD's Internal Culture is Resistant to Effective Discipline

The longstanding deficiencies in BPD's systems for investigating complaints has contributed to a cultural resistance to accountability that persists in the Department. The cultural opposition to meaningful accountability within the Department is reflected by the lack of discipline for serious misconduct and widespread violations of minor policy provisions; the failure to take action against officers with a known reputation for repeatedly violating Department policy and constitutional requirements; and the reluctance of officers to report observed misconduct for fear that doing so will subject them to retaliation.

### a. BPD Has Allowed Violations of Policy To Go Unaddressed Even When They Are Widespread Or Involve Serious Misconduct

In part because of the above failures in investigating complaints against officers, BPD allows policy violations to go unaddressed, even when they occur in large number or involve serious misconduct. For example, the most common allegations of policy violation that fall under command investigations level is that officers fail to appear in court. The Department's internal affairs database indicates that 6,571 allegations were made that officers failed to appear in court between January 1, 2010, and March 28, 2016. For 1,698 of these allegations, the Department did not record any disposition at all, although a "completed date" has been entered for all but a handful of these incidents, indicating that the investigation has concluded. Additionally, the Department "administratively closed" 1,142 of the cases. Thus, nearly half of these policy violations—43 percent—resulted in no action being taken against the officer for failing to appear in court. Without the arresting or witnessing officer's testimony, many of these cases lack adequate evidence to proceed, and are dismissed.

Moreover, we found evidence that some BPD officers engage in criminal behavior that BPD does not sufficiently address. We heard complaints from the community that some officers target members of a vulnerable population—people involved in the sex trade—to coerce sexual favors from them in exchange for avoiding arrest, or for cash or narcotics. This conduct is not only criminal, it is an abuse of power. Unfortunately, we not only found evidence of this conduct in BPD's internal affairs files, it appeared that the Department failed to adequately investigate allegations of such conduct, allowing it to recur.

For example, BPD investigators became aware of one officer's alleged misconduct in March of 2012 when they conducted a "prostitution initiative" "for the purposes of gathering intelligence and obtaining confidential informants relating to police corruption." One of the women interviewed informed BPD investigators that she met with a certain officer and engaged in sexual activities in the officer's patrol car once every other week "in exchange for U.S. Currency or immunity from arrest." The Department administratively closed the case nine months later,

without, it appears, referring the matter for criminal prosecution or interviewing the accused officer, or any other potential witnesses.

Ten months after closing the first investigation, the Chief of BPD's Office of Professional Responsibility received an anonymous "Crime Stoppers" tip that the same officer was "having sex in his patrol vehicle" with a different person involved in the sex trade. The Department initiated a new investigation, and assigned the case to a different detective. One day after opening the investigation, an assistant state's attorney directed the detective to subpoena the woman's phone records for a six month-period. The detective waited more than a month to do so, and then did not review those records for another six months, until May of 2014. The records confirmed that the officer and the woman exchanged 237 text messages and five phone calls in the six-month period for which records were subpoenaed. Approximately four months later, the State's Attorney's Office declined to prosecute the officer, though BPD's administrative investigation remained open.

Four months after the State's Attorney's Office declined to prosecute, in February of 2015, BPD received a third, new tip that the same officer was engaging in sexual activities with the same woman involved in the sex trade who was mentioned in the "Crime Stoppers" tip. The new tip came from a neighboring Police Department, which interviewed the woman and subpoenaed her phone records in the course of an investigation. Though BPD's administrative investigation into the "Crime Stoppers" tip remained open, BPD opened a third, separate investigation into the new tip, assigning a new, third detective to investigate the same officer's conduct. The case was assigned "low" priority. The third BPD detective attempted to interview the woman but postponed the interview because she was in ill health. Two days later, the woman passed away. The investigators finally reviewed the officer's phone records, which indicated that the officer had exchanged text messages—some sexually explicit—with several other women whose numbers were linked to online profiles for sex trade services. Finally, months later, Department investigators interviewed the officer two times in connection with the two open investigations. The allegations resulting from the "Crime Stoppers" tip and the third investigation were eventually sustained in the fall of 2015, based largely on the evidence provided by the neighboring Police Department. The officer was allowed to resign from BPD. It is unclear from BPD's files whether any state authorities were notified of the officer's sexual misconduct.

This was not the only case in which allegations were made that officers coerced sex in exchange for immunity from arrest. We found other complaints of this nature were also not properly investigated. Failing to properly investigate allegations that officers were engaged in sexual misconduct is troubling in light of the concerns of gender bias discussed *supra* at 122-27. Failing to properly investigate and address repeated policy violations and serious misconduct also does a disservice to community members and the vast majority of law-abiding BPD officers who are unfairly tainted by the misconduct of a few. By failing to timely address repeated policy violations and misconduct the Department does harm to its internal credibility and external legitimacy.

### b. BPD Has Failed To Take Action Against Offenders Known to Engage in Repeated Misconduct

Our investigation also found substantial evidence that BPD fails to take disciplinary action against officers BPD knows have engaged in serious or repeated misconduct. One example of this

problem is the so-called "Do Not Call" list. BPD has had notice, including from the State's Attorney's Office, that particular officers may be engaging in behavior that is, at a minimum, unethical and impacts their credibility and integrity. Through at least 2011, the State's Attorney's Office maintained a formal "Do Not Call" list of officers prosecutors would not call to testify because they believed their testimony would be undermined by issues of credibility or integrity. The size of this list varied over time, and included as many as a dozen officers. BPD was aware of the list—the State's Attorney's office regularly discussed the officers on the list with the Chief of BPD's Office of Professional Responsibility—but failed to take action on the information. Instead, the officers listed remained on the streets, making arrests that could not be credibly prosecuted. At one point, we were told, an entire squad's members were on the list, leading to a number of cases being dismissed. Although the formal "Do Not Call" list has been discontinued, the State's Attorney's Office continues to discuss problem officers with BPD.

BPD's ability to take disciplinary action against officers on the "Do Not Call" list is expressly circumscribed by LEOBR and BPD's contract with the police union. Specifically, BPD cannot take punitive action against the officer "based solely on the fact that [the] officer is included on the list," including demotion, dismissal, suspension without pay, or reduction in pay.[131] Because of this prohibition, BPD has not taken any action against officers that the State's Attorney's Office has notified BPD cannot be called to testify, and these officers remain on duty. Particularly given the evidence of numerous unlawful stops, searches, and arrests that we found, the fact that officers whose arrests are not able to be prosecuted remain on the street is troubling. While LEOBR may prevent the Department from taking disciplinary action against officers solely for appearing on the list, it does not prevent the Department from taking other action, including initiating its own investigation of officers' conduct to independently determine whether discipline, training, reassignment, or other action is appropriate.

We also found evidence that BPD fails to take action against officers with a long history of misconduct that is well known to the Department. Our investigation found, for example, that one officer currently employed by BPD has received approximately 125 complaints from complainants within the Department and from the community since 2010, and many of these complaints allege serious misconduct. Indeed, complaints from different individuals alleged remarkably similar facts—specifically, that the officer subjects civilians to unwarranted strip and cavity searches in public. But the Department has sustained only one complaint against the officer for minor misconduct—for not filing a proper vehicle inventory report, resulting in the loss of a camera valued at $1,200. The officer was "verbally counseled on the proper procedure" for filling out inventory reports. Although we were unable to conclusively determine whether other complaints should have been sustained based on the information BPD provided, such a large number of complaints, including unrelated complaints alleging similar behavior, is troubling. We have serious concerns that BPD is not adequately addressing repeated misconduct by its officers.

### c. BPD Officers are Reluctant to Report Misconduct

BPD's systemic accountability failures have also contributed to a culture in which some officers are reluctant to raise concerns to supervisors about problematic policing practices or identify misconduct by their fellow officers. Several officers told Justice Department investigators that they

---

[131] Md. Code Ann., Pub. Safety § 3–106.1.

believe their fellow officers have retaliated against them for reporting misconduct or objecting to improper enforcement activities. Other officers expressed fears that they would face such retaliation, and that BPD supervisors would not address any retaliation that occurs. Our review of BPD's internal affairs files underscores these concerns.

Several examples highlight BPD's resistance to internal accountability. In 2014, a BPD lieutenant placed several signs next to the desk of an African-American sergeant with a reputation for speaking out about alleged misconduct in the Department. Among the signs were warnings to "stay in your lane," "worry about yourself," "mind your own business!!" and "don't spread rumors!!!" After the sergeant filed a complaint about the signs, the lieutenant admitted to creating them and placing them next to the sergeant's desk. Yet BPD took no meaningful corrective action. Though the complaint was sustained, the lieutenant received no suspension, fine, or loss of benefits. Instead, he was given only "verbal counseling" instructing him that such behavior is "unprofessional and inappropriate." This minimal response to admitted allegations that a supervisor warned his subordinate to "mind your own business" rather than report misconduct underlines BPD's failure to create a culture of accountability.

In a widely-publicized incident,[132] a former BPD detective in the Violent Crime Impact Division (VCID) faced retaliation after reporting two officers, including his sergeant, for alleged excessive force in the fall of 2011. According to the detective, the VCID unit arrested a man for drug possession after a chase that ended with the man breaking into the home of an officer's girlfriend to hide. According to the officers' reports of the incident, after the man's arrest the sergeant brought him back inside the home to "apologize" to the woman living there. When the man emerged from the home, his shirt was ripped open, he was bleeding, and had suffered a broken ankle and other injuries. The sergeant claimed that the arrested man injured himself by attempting to head-butt the sergeant and falling to the ground. Concerned that the sergeant and off-duty officer had beaten the man inside the home, the detective asked a different BPD sergeant whether to report the incident to internal affairs. According to the detective, the sergeant discouraged him from reporting the incident, stating "If you're a rat, your career here is done." The detective reported the incident to prosecutors in the State's Attorney's Office, who indicted both officers on criminal charges stemming from the incident. After the detective testified against the officers at trial, a jury convicted the sergeant of misconduct and the off-duty officer of assault and obstruction of justice.

The detective faced significant retaliation for exposing this misconduct. The detective recounted that, after reporting the incident to prosecutors, fellow officers frequently called him a "rat." A sergeant left pictures of cheese on the detective's desk. The detective also told us that a lieutenant denied his transfer request to a violent repeat offender squad because the detective "snitched." The lieutenant allegedly said that the detective was "not the right fit" for the unit because they "have to do things in the gray area." And on two occasions, no one in the detective's

---

[132] *See* Justin Fenton, *Whistle-blower officer files lawsuit against Batts, BPD*, The Baltimore Sun (Dec. 23, 2014, 6:55 PM), http://www.baltimoresun.com/news/maryland/baltimore-city/bs-md-ci-crystal-whistleblower-ratgate-lawsuit-20141223-story.html; Albert Samaha, *Breaking Baltimore's Blue Wall of Silence*, Buzzfeed (May 14, 2015, 9:09 PM), https://www.buzzfeed.com/albertsamaha/breaking-baltimores-blue-wall-of-silence?; Luke Broadwater, *Baltimore to pay $42K to whistle-blower former officer who found rat on car*, The Baltimore Sun (June 1, 2016, 7:14 PM), http://www.baltimoresun.com/news/maryland/baltimore-city/bs-md-ci-crystal-settlement-20160601-story.html.